Francis GILBERT, M.D., Petitioner-Appellant,

v.

State of Wisconsin, MEDICAL EXAMINING BOARD,
Respondent-Petitioner.

Supreme Court

*No. 82–1203. Argued February 27, 1984.—Decided June 14, 1984.*

(Also reported in 349 N.W.2d 68.)

For the respondent-petitioner the cause was argued by *LeRoy L. Dalton,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the petitioner-appellant there was a joint brief by *Jeff Scott Olson* and *Julian & Olson, S.C.*, and *Michael R. Fox, Terence S. Hawkins* and *Fox Law Offices*, all of Madison, and oral argument by *Jeff Scott Olson*.

LOUIS J. CECI, J. This review of an unpublished decision of the court of appeals concerns the Medical Examining Board's (Board) revocation of the license of Francis X. Gilbert, M.D., after the Board's finding that Gilbert's actions on September 27, 1975, constituted unprofessional conduct as defined in sec. 448.18(1)(g), Stats. 1973, and sec. Med. 16.02(1)(g), Wis. Admin. Code, 1975.[1] The circuit court for Dane county, Hon-

---

[1] Section 448.18(1), Stats. 1973, applies in this instance, because Dr. Gilbert's treatment of the patient occurred on September 27, 1975. Section 448.18(1) provides,

"**448.18 Revocation.** (1) "Immoral or unprofessional conduct" as used in this section mean: (a) Procuring, aiding or abetting a criminal abortion; (b) advertising in any manner either in his own name or under the name of another person or concern, actual or pretended, in any newspaper, pamphlet, circular, or other written or printed paper or document the curing of venereal diseases, the restoration of "lost manhood", the treatment and curing of private diseases peculiar to men or women, or the advertising or holding himself out to the public in any manner as a specialist in diseases of the sexual organs, or diseases caused by sexual weakness, self-abuse or excessive indulgences, or in any diseases of a like nature or produced by a like cause, or the advertising of any medicine or any means whatever whereby the monthly periods of women can be regulated or the menses reestablished, if suppressed, or being employed by or in the service of any person, or concern, actual or pretended so advertising; (c) the obtaining of any fee; or offering to accept a fee on the assurance or promise that a manifestly incurable disease can be or will be permanently cured; (d) wilfully betraying a professional secret; (e) indulging in the drug habit; (f) conviction of an offense involving moral turpitude; *(g) engaging in conduct unbecoming a person licensed to practice or detrimental to the best interests of the public.*" (Emphasis added.)

orable Angela Bartell, Circuit Judge, affirmed the Board's ruling. The court of appeals reversed and re-

Chapter 448 was amended by the 1975 Laws of Wisconsin, effective June 15, 1976, nine months after Gilbert's treatment of the patient.

Section Med. 16.02(1), Wis. Admin. Code, cr. Register April 1975, No. 232, effective May 1, 1975, also applies, and reads as follows:

"**Med 16.02 Definitions.** (1) *The terms "practices that are inimical to the public health", "conduct unbecoming a person licensed to practice or detrimental to the best interest of the public", "unprofessional conduct", and "unprofessional acts" are defined to mean and include* but not be limited to the following, or aiding or abetting the same:

"(a) Violating, or attempting to violate, any provision or term of chapter 448 of the statute or of any valid rule of the examining board.

"(b) Knowingly making or presenting or causing to be made or presented, any false, fraudulent, or forged statement, writing, certificate, diploma, or other thing in connection with any application for license or certificate.

"(c) Practicing, fraud, forgery, deception, collusion, or conspiracy in connection with any examination for license or certificate.

"(d) Giving, selling, buying, bartering, or attempting to give, sell, buy or barter any license or certificate granted by the examining board.

"(e) Engaging in, or attempting to engage in, the practice of medicine or treating the sick, under any given name or surname other than that under which originally licensed or registered to practice in this or any other state. This subsection does not apply to change of name resulting from marriage, divorce, or order by a court of record.

"(f) Aiding, assisting, or abetting the unlawful practice of medicine and surgery or treating the sick.

"*(g) Any practice or conduct under license or certificate granted by the examining board which tends to constitute a danger to the health, welfare, or safety of the patient or public.*

"(h) Practicing medicine and surgery or treating the sick or attempting to do so when unable to do so with reasonable skill and safety to patients.

manded the circuit court's order, directing that the circuit court instruct the Board to reinstate Gilbert's license

"(i) Offering, undertaking, or agreeing to treat or cure a disease or condition by a secret means, method, device, or instrumentality; or refusing to divulge to the examining board upon demand the means, method, device, or instrumentality used in the treatment of a disease or condition." (Emphasis added.)

Section Med. 16.02 was replaced by Med. 10.02, effective November 1, 1976, also eleven months after the alleged conduct. This is the regulation which the Board utilized. It reads,

"**Med 10.02 Definitions.** (1) For the purposes of these rules:

"(a) 'Board' means the medical examining board.

"(b) 'License' means any license, permit, certificate, or registration issued by the board.

"(2) *The term 'unprofessional conduct' is defined to mean* and include but not be limited to the following, or aiding or abetting the same:

"(a) Violating or attempting to violate any provision or term of chapter 448 of the statutes or of any valid rule of the board.

"(b) Violating or attempting to violate any term, provision, or condition of any order of the board.

"(c) Knowingly making or presenting or causing to be made or presented any false, fraudulent, or forged statement, writing, certificate, diploma, or other thing in connection with any application for license.

"(d) Practicing fraud, forgery, deception, collusion, or conspiracy in connection with any examination for license.

"(e) Giving, selling, buying, bartering, or attempting to give, sell, buy, or barter any license.

"(f) Engaging or attempting to engage in practice under any license under any given name or surname other than that under which originally licensed or registered to practice in this or any other state. This subsection does not apply to change of name resulting from marriage, divorce, or order by a court of record.

"(g) Engaging or attempting to engage in the unlawful practice of medicine and surgery or treating the sick.

"(h) Any practice or conduct which tends to constitute a danger to the health, welfare, or safety of patient or public.

"(i) Practicing or attempting to practice under any license when unable to do so with reasonable skill and safety to patients." (Emphasis added.)

to practice medicine. We reverse the court of appeals and remand the cause to the Board.

This case involves Dr. Gilbert's treatment of accident victim Renee Pfaff on September 27, 1975.[2] On that date, the petitioner, Dr. Gilbert, was called by a nurse at St. Mary's Kewaunee Area Memorial Hospital and told that one of his patients, Henry Severin, required treatment for a saw injury to the patient's hand. Dr. Gilbert went immediately to the hospital and observed that his patient had sustained deep lacerations and maceration of the hand's tissue, a compound fracture of the index finger, and some tearing of the tendons. Gilbert immediately undertook the necessary repair work, which involved some rather extensive procedures, such as repair of a tendon, debridement, removal of bone splinters, suturing the lacerations, removal of part of a fingernail, and controlling arterial bleeding. Gilbert performed these procedures in the large emergency room at the hospital.

At approximately 10:20 a.m., a registered nurse on duty at the hospital received a call from an ambulance attendant at the scene of an automobile accident. The attendant told the nurse that a young woman had been seriously injured, with a possible leg fracture, and that he had "oxygen on her."

At the time of this incident, St. Mary's emergency room was not staffed or equipped to handle major trauma

[2] The first official proceeding involving Dr. Gilbert was commenced before the patients compensation panel, pursuant to ch. 655, Stats., by Pfaff's estate in 1977. The proceeding was originally brought against St. Mary's Hospital and the doctor who was on call for the emergency room on September 27, 1975. Dr. Gilbert was brought into the proceeding by the hospital and the on-call doctor as a third-party defendant. On March 23, 1977, the panel ordered the case dismissed because Pfaff's estate withdrew its opposition to motions to dismiss. The estate did not commence a court action pursuant to sec. 655.19.

cases. The closest major trauma center was located at St. Vincent's Memorial Hospital in Green Bay, Wisconsin, twenty-eight miles from St. Mary's. The policy in the Kewaunee area was that a major trauma case should not be brought to St. Mary's unless it appeared that the victim could not survive the trip to Green Bay and needed stabilization before making the trip.

The accident victim in this case, Renee Pfaff, a twenty-three-year-old nursing student, was brought to St. Mary's emergency room at approximately 10:35 a.m. Following the call from the ambulance attendant, the nurse had told Dr. Gilbert of the victim's pending arrival. Apparently, Gilbert had asked the nurse to notify Dr. Nesemann of the emergency, because Nesemann was the doctor on call for the emergency room, and Gilbert was already occupied with a patient.

There is some dispute in the record as to what occurred next. Apparently, Gilbert agreed to treat Pfaff because Nesemann was aware that Gilbert, one of the group of physicians who normally shared rotating call for the emergency room, was already in the emergency room. However, Gilbert refused to leave his own patient, because he testified that he was working under sterile conditions and did not want to contaminate himself. Therefore, he instructed the nurse to start an IV on the patient if she appeared to be in shock and to get an x-ray on the injured leg. Pfaff had been taken to a separate room from the one where Dr. Gilbert was working when she arrived at the hospital, so that she was not visible to Gilbert.

Ultimately, Gilbert did attend to Pfaff at approximately 11:00 a.m., giving her a cursory physical assessment in the doorway of the x-ray room where she had been left on an ambulance cart. The IV of five percent dextrose and water, which had been started by the nurse at around 10:45, had become infiltrated or, in other

words, was running outside the vein and was, therefore, ineffective. Gilbert attempted to stabilize Pfaff throughout the day in order to transport her to a surgeon in Green Bay, since he suspected internal injuries involving at least a ruptured spleen, but was unable to stabilize Pfaff. Dr. Gilbert pronounced Renee Pfaff dead at 5:33 p.m. in St. Mary's emergency room.

In July of 1978, the Medical Examining Board received a letter from the former hospital administrator at St. Mary's Hospital, asking the Board to investigate Dr. Gilbert's medical practices, in particular his September 27, 1975, treatment of Renee Pfaff. An investigation was conducted, and the Board member conducting the investigation determined in December of 1978 that there was sufficient evidence to require a separate evaluation by an independent medical consultant.

Dr. Martin Janssen was obtained as an independent medical consultant. On October 2, 1979, Dr. Janssen informed the regulation and licensing attorney handling the Gilbert investigation that in his professional opinion, Dr. Gilbert's treatment of Pfaff had tended to constitute a danger to her health, welfare, and safety in eight respects.

On October 10, 1979, a formal complaint was issued against Dr. Gilbert by the Wisconsin Medical Examining Board, based upon Dr. Janssen's report. The complaint charged in part,

"5. That Respondent while caring for and treating Renee Pfaff engaged in a course of practice and conduct which tended to constitute a danger to the health, welfare and safety of Renee Pfaff in the following respects:

"a. Respondent failed to respond promptly and appropriately to the acute medical emergency which existed at the time of Renee Pfaff's admission to the emergency room.
"b. Respondent failed to provide adequate and proper treatment for low blood pressure and shock.

"c.  Respondent failed to take or have taken a chest x-ray necessary to evaluate Renee Pfaff's condition.

"d.  Respondent failed to properly perform or have performed a four quadrant abdominal tap necessary to evaluate Renee Pfaff's medical condition.

"e.  Respondent failed to diagnose and treat Renee Pfaff's ruptured spleen.

"f.  Respondent ordered and administered or had administered Demerol when the use of said drug was contraindicated by Renee Pfaff's medical condition.

"g.  Respondent failed to have Renee Pfaff transferred to another medical facility and to care of other medical personnel better equipped to treat and care for Renee Pfaff when he knew or should have known that he was unable to stabilize her condition or adequately care for and treat her.

"h.  Respondent failed to make a sufficiently vigorous attempt to obtain assistance from other physicians and medical personnel at or associated with St. Mary's Kewaunee Area Memorial Hospital when he knew or should have known that he was unable to deal with this acute medical emergency by himself or with the aid and assistance of those medical personnel then present.

"6.  That engaging in any practice or conduct which tends to constitute a danger to the health, welfare or safety of a patient constitutes unprofessional conduct within the meaning of Wis. Stats. Sec. 448.02(3) and Wis. Stats. Sec. 448.18(1)(g), (1973), and Wis. Adm. Code Sec. MED 10.02(2)(h)."

On June 30 and July 1, 1980, and on August 25 and 26, 1980, a hearing was conducted before attorney David Beld, a hearing examiner for the Board. In June of 1981, the hearing examiner submitted a proposed decision to the Board, having concluded that Gilbert's license should not be revoked, but that the doctor should be formally reprimanded. The hearing examiner concluded

that Gilbert's conduct in treating Pfaff did not constitute "unprofessional conduct" under sec. 448.18(1)(g), Stats., and sec. Med. 10.02(2)(h) (formerly sec. Med. 16.02(1)(g)), Wis. Admin. Code, in eight respects, but that it did constitute "unprofessional conduct" in one respect. With regard to the one determination of unprofessional conduct, the examiner concluded the following:

"That Gilbert's failure to visually assess the condition of the seriously injured auto accident victim, Renee Pfaff, upon her arrival at St. Mary's Kewaunee Area Memorial Hospital, constituted unprofessional conduct within the meaning of sec. 448.18(1)(g), Wis. Stats. (1973) and sec. 448.02(3), Wis. Stats.; and was conduct which tended to constitute a danger to the health, safety and welfare of Renee Pfaff within the meaning of sec. MED 10.02(2)(h), Wis. Adm. Code."

The Board on October 27, 1981, adopted all of the hearing examiner's proposed findings and added two findings of fact. The Board also determined three instances of unprofessional conduct in addition to the hearing examiner's determination that the doctor's failure to initially assess Pfaff visually constituted unprofessional conduct.[3] The Board then revoked Gilbert's license, as authorized by sec. 448.02, Stats. 1975.[4]

---

[3] The Board's conclusions of law provide in part,

"(2) That Gilbert's failure to visually assess the condition of the seriously injured auto accident victim, Renee Pfaff, upon her arrival at St. Mary's Kewaunee Area Memorial Hospital, constitutes unprofessional conduct within the meaning of sec. 448.18(1)(g), Wis. Stats. (1973) and sec. 448.02(3), Wis. Stats.; and was conduct which tended to constitute a danger to the health, safety and welfare of Renee Pfaff within the meaning of sec. MED 10.02(2)(h), Wis. Adm. Code.

"3. That Gilbert failed to provide timely and adequate treatment for Renee Pfaff's low blood pressure and shock and that such failure constitutes unprofessional conduct within the meaning

On November 2, 1981, Gilbert commenced an action in circuit court pursuant to ch. 227, Stats. Gilbert con-

of sec. 448.18(1)(g), Wis. Stats. (1973); sec. 448.02(3), Wis. Stats.; and sec. MED 10.02(2)(h), Wis. Adm. Code.

". . .

"6. That Gilbert failed to provide timely and adequate management of Renee Pfaff's perceived severe abdominal injury, and that such failure constitutes unprofessioinal conduct within the meaning of sec. 448.18(1)(g), Wis. Stats. (1973), sec. 448.02(3), Wis. Stats., and sec. MED 10.02(2)(h), Wis. Adm. Code.

". . .

"8. That Gilbert failed to institute rapid, timely resuscitation and to effect early transfer to another treating facility, and that such failure constitutes unprofessional conduct within the meaning of sec. 448.18(1)(g), Wis. Stats. (1973), sec. 448.02(3), Wis. Stats., and sec. MED. 10.02(2)(h), Wis. Adm. Code."

[4] Neither party has raised the issue that under the applicable 1973 statutes, the Board did not have authority to revoke licenses itself. The Board was statutorily empowered to temporarily suspend the license under sec. 448.18(7), but for no more than two consecutive three-month periods. In order for a license to be revoked, the Board was to have "institute[d] . . . action to revoke," under sec. 448.17, and the revocation occurred at the trial court level. Section 448.17, Stats. 1973, provides,

"**Investigation; hearing.** The examining board shall investigate, hear and act upon practices by persons licensed to practice medicine and surgery under s. 448.06, that are inimical to the public health. The examining board shall have the power to warn and to reprimand, when it finds such practice, and to institute criminal action or action to revoke license when it finds probable cause therefor under criminal or revocation statute, and the attorney general may aid the district attorney in the prosecution thereof."

Section 448.18, Stats. 1973, provides in part,

"(7) A license or certificate of registration may be temporarily suspended by the examining board, without formal proceedings, and its holder placed on probation for a period not to exceed 3 months where he is known or the examining board has good cause to believe that such holder has violated sub. (1). The examining board shall not have authority to suspend a license or certificate of registration, or to place a holder on probation, for more than 2 consecutive 3-month periods. All examining board actions under this subsection shall be subject to review under ch. 227."

tended that the Board's order should be reversed or modified because of the following allegations: Procedural errors made by the Board, its erroneous interpretation of the law, findings of fact that were unsupported by substantial evidence in the record, and that the Board's revocation of Gilbert's license amounted to an abuse of discretion.

On June 23, 1982, Circuit Court Judge Angela Bartell issued a lengthy memorandum decision, affirming the Board's order. The judge concluded that the Board had jurisdiction over the disciplinary proceeding involving Gilbert; that the Board had committed no procedural errors; and that the Board's determinations were sup-

The 1975 Laws of Wisconsin, ch. 383, sec. 3, effective June 15, 1976, nine months after Gilbert's alleged conduct, granted the Board the authority to revoke licenses. Section 448.02, Stats. 1975, provides in part,

"(3) INVESTIGATION; HEARING; ACTION. The board shall investigate allegations of unprofessional conduct by persons holding a license or certificate granted by the board. A finding by a panel established under s. 655.02 or by a court that a physician has acted negligently is an allegation of unprofessional conduct. After the investigation, if the board finds that there is probable cause to believe that the person is guilty of unprofessional conduct, the board shall hold a hearing on such conduct. The board may, when it finds a person guilty of unprofessional conduct, warn or reprimand that person, or limit, suspend or revoke any license or certificate granted by the board to that person. The board shall adopt rules of procedure for such investigation, hearing and action under ch. 227."

Because this is a procedural change in the statutes, we will apply sec. 448.02, 1975 retroactively. *Gutter v. Seamandel*, 103 Wis. 2d 1, 17, 308 N.W.2d 403 (1981). Gilbert faced revocation of his license under both the 1973 and 1975 statutes. The 1975 amendment merely changed the forum where he faced revocation from the trial court to the Board.

Throughout the remainder of this decision, we will refer to the standard as set forth in sec. 448.18(1)(g), Stats. 1973. However, we will address the remaining portion of ch. 448 through the 1975 statutes.

ported by substantial evidence and did not constitute an abuse of discretion.

Gilbert subsequently appealed to the court of appeals. On April 15, 1983, in an unpublished opinion, the court set aside the Board's order and reversed the order of the circuit court, directing the court to instruct the Board to reinstate Gilbert's license to practice medicine. The court of appeals determined that neither sec. 448.-18(1)(g), Stats., nor sec. Med. 16.02(1)(g), Wis. Admin. Code, provided an adequate standard whereby the Board could find Gilbert guilty of unprofessional conduct. The court concluded that if a physician's license could be put in jeopardy every time the doctor does anything which is "detrimental" or "tends to constitute a danger," both the statute and regulation were unreasonable.

Comparing unprofessional conduct to negligence, the court noted that even the most skillful treatment may involve hazards to a patient and that as a result, an unsuccessful outcome following treatment does not of itself prove negligence. *Rost v. Roberts,* 180 Wis. 207, 192 N.W. 38 (1923). Similarly, the court reasoned that even the most routine procedures entail accompanying risks of danger to the patient; therefore, each time a physician undertakes treatment of a patient, he or she may be engaging in conduct which is "detrimental" or "tends to constitute a danger" to the patient. The court, therefore, concluded that in this case, "there is no evidence of what the standard of care was or that the conduct complained of was reasonably foreseeable as causing harm." Consequently, the court reversed and remanded the cause.

The Board subsequently petitioned this court for review of the court of appeals decision, and we granted the petition.

In this review, we are concerned with two issues. They are: (1) Was the delegation of legislative authority to the Medical Examining Board invalid; and (2) is there

sufficient evidence in the record to support the Board's finding that Dr. Gilbert's actions constituted "unprofessional conduct" as defined by sec. 448.18(1)(g), Stats., and sec. Med. 16.02(1)(g), Wis. Admin. Code?

I.

## WAS THE DELEGATION OF LEGISLATIVE AUTHORITY TO THE MEDICAL EXAMINING BOARD INVALID?

In this review, we are concerned with the Board's power to revoke a physician's license to practice medicine in the state of Wisconsin, for violation of the standards of conduct set out in sec. 448.18(1)(g), Stats., and sec. Med. 16.02(1)(g), Wis. Admin. Code. Section 448.03(1), provides that one must possess such a license to practice medicine in order to represent himself or herself as a doctor. The relevant portion of sec. 448.18, entitled "Revocation," reads as follows:

"(1) 'Immoral or unprofessional conduct' as used in this section mean: . . . (g) engaging in conduct unbecoming a person licensed to practice or detrimental to the best interests of the public."

Section Med. 16.02, Wis. Admin. Code, reads as follows:

"(1) The terms 'practices that are inimical to the public health,' 'conduct unbecoming a person licensed to practice or detrimental to the best interest of the public,' 'unprofessional conduct,' and 'unprofessional acts' are defined to mean and include but not be limited to the following, or aiding or abetting the same:
". . .
"(g) Any practice or conduct under license or certificate granted by the examining board which tends to constitute a danger to the health, welfare, or safety of the patient or public.
". . .

At the court of appeals level, Gilbert argued that while the term "unprofessional conduct has been held to be sufficiently definite to meet constitutional standards" because of recent case law construing the term, there was no evidence in the record to support the Board's finding that Gilbert had indeed engaged in unprofessional conduct. However, apparently in response to the court of appeals decision that both the statute and regulation are "invalid as unreasonable," Gilbert has now argued that "the palpable ambiguity of the regulatory and statutory language rendered it so subject to the wildest misinterpretation . . . that they violated the rule of reason limiting the delegation of legislative authority to administrative bodies." It appears that Gilbert has taken the position that the statute empowers the Medical Examining Board to exercise essentially standardless discretion is disciplining physicians. This involves a challenge to the standard set out in the statute, similar to the attack in *Westring v. James,* 71 Wis. 2d 462, 467, 238 N.W.2d 695 (1976). Gilbert's challenge centers around the delegation of legislative power to the Medical Examining Board—that the statutory delegation is not circumscribed with a definite standard that characterizes the legislative duties to be exercised by the Board.

Article IV, sec. 1 of the Wisconsin Constitution provides that, "The legislative power shall be vested in a senate and assembly." Taken literally, this provision would bar any delegation of legislative power to administrative agencies. However, this court has long recognized that the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government. *See, In Matter of Guardianship of Klisurich,* 98 Wis. 2d 274, 279–80, 296 N.W.2d 742 (1980) ; *Schmidt v. Local Affairs & Development Dept.,* 39 Wis. 2d 46, 58, 158 N.W.2d 306 (1968) ; and *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. 472, 505–06, 220 N.W. 929 (1928).

Originally, this court focused upon the nature of the power delegated.

"The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose, in the language of Chief Justice Marshall 'to fill up the details;' in the language of Chief Justice Taft 'to make public regulations interpreting the statute and directing the details of its execution.' It is legislative power of the latter kind which is oftentimes called the rule-making power of boards, bureaus, and commissions.

"It only leads to confusion and error to say that the power to fill up the details and promulgate rules and regulations is not legislative power." *State ex rel. Wis. Inspection Bureau v. Whitman*, 196 Wis. at 505–06.

Since 1928, however, the doctrine of the delegation of legislative power has shifted the focus away from the nature of the power delegated through scrutiny of the delegating standard's language and more toward the safeguards surrounding the delegated power. Professor Davis, in discussing the doctrine of delegation to administrative agencies, has suggested the following:

"The focus should not be exclusively on standards; it should be on the totality of protections against arbitrariness, including both safeguards and standards."

He concludes that the judiciary should shift its focus away from the requirement of "meaningful statutory standards" and should instead require protections against "unnecessary and uncontrolled discretionary power" by the agency. *See,* 1 Davis, *Administrative Law Treatise,* sec. 3:15 at 206–07 (2d ed. 1978).

This court has recognized this shift toward the requirement of adequate procedural safeguards. In *Schmidt v. Local Affairs & Development Department,* 39 Wis. 2d 46, this court observed that it may take a more liberal attitude toward delegations of legislative authority to an administrative agency than it may toward delegations to the judiciary. The *Schmidt* court utilized the following reasons to explain this more liberal approach:

"The legislative [sic] agency or director is, in fact, an arm or agent of the legislature itself. The very existence of the administrative agency or director is dependent upon the will of the legislature; its or his powers, duties and scope of authority are fixed and circumscribed by the legislature and subject to legislative change. . . . An administrative agency is subject to more rigid control by the legislature and judicial review of its legislative authority and the manner in which that authority is exercised." *Id.* at 56–57.

The *Schmidt* court concluded that the existence of safeguards is an appropriate consideration when addressing a question of legislative delegation. *Id.* at 57, citing *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. at 507–08.

Subsequently, in *Westring v. James,* 71 Wis. 2d 462, this court utilized the following language concerning statutes which delegate legislative power to administrative agencies:

" 'A delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose.' " *Id.* at 468, citing *Watchmaking Examining Bd. v. Husar,* 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971).

Therefore, consistent with this evolution of the delegation of legislative power, we will first turn our attention to the purpose behind the delegating statutes.

The statute which delegates general power to the Medical Examining Board is sec. 15.08, Stats. 1973, entitled "Examining boards." The pertinent section provides,

"(5) GENERAL POWERS. Each examining board may compel the attendance of witnesses, administer oaths, take testimony and receive proof concerning all matters within its jurisdiction. It shall formulate rules for its own guidance and for the guidance of the trade or profession to which it pertains, and define and enforce professional conduct and unethical practices not inconsistent with the law relating to the particular trade or profession."

The Board's powers are set out more specifically in ch. 448, which deals with the licensing of physicians and contains the above-quoted standard for the revocation of licenses in sec. 448.18(1)(g). Section 448.02, 1975 deals with the Board's authority to grant licenses, and sec. 448.05, 1975, dealing with qualifications for licensure, contains the following language:

"(1) GENERAL REQUIREMENTS. To be qualified for the grant of any license or certificate by the board, an applicant must:
"(a) Supply evidence satisfactory to the board that the applicant is of good professional character.
"(b) Meet the specific requirements as set out in this section for that class of license or certificate for which applying.
"(c) Achieve a passing grade in the examinations required in this section.
"(d) Be found qualified by three-fourths of the members of the board, except that an applicant for a temporary license under s. 448.04(1)(b)1 and 3, (d) and (e) must be found qualified by 2 officers of the board."[5]

---

[5] More specifically, sec. 448.05, Stats., contains the following requirements for a license to practice medicine and surgery:

"(2) LICENSE TO PRACTICE MEDICINE AND SURGERY. An applicant for any class of license to practice medicine and surgery must supply evidence satisfactory to the board that the applicant is

This court has acknowledged that the purpose of licensing statutes is not to benefit those persons licensed to practice under the statutes, but rather to protect the public by the requirement of a license as a condition precedent to practicing in a given profession. The granting of a license pursuant to such a statute has been characterized as a privilege. *Strigenz v. Department of Regulation,* 103 Wis. 2d 281, 286, 307 N.W.2d 664 (1981). Such statutes are grounded in the state's police power to protect the public welfare through safeguarding the life, health, and property of its citizens. *State ex rel. Wis. R. Bd. of A. & P.E. v. T.V. Eng.,* 30 Wis. 2d 434, 438–39, 141 N.W.2d 235 (1966). Occupational licensing requirements follow a legislative determination that the

a graduate of and possesses a diploma from a medical or osteopathic college approved by the board and has completed postgraduate training of 12 months in a facility approved by the board. If an applicant is a graduate of a foreign medical school which has not been approved by the board, and if such applicant has had postgraduate training in this country in a 12-month program approved by the board or has had other professional experience which the board deems has given the applicant the education and training substantially equivalent, and if such applicant has passed the examinations given by the educational council for foreign medical graduates or its successors, the board may make such additional inquiry including a personal interview as satisfies it that the applicant has had such education and training. If a majority of the board is so satisfied, the applicant may then be admitted to examination for a license to practice medicine and surgery. If an applicant is a graduate of a foreign medical school not approved by the board, and such foreign medical school requires either social service or internship or both of its graduates, and if such applicant has not completed such requirements but has completed a 12-month supervised clinical training program under the direction of a medical school approved by the board and has complied with all other requirements of this subsection for graduates of foreign medical schools not approved by the board, the applicant may then be admitted to examination for a license to practice medicine and surgery."

public's health and safety require protection from "incompetent practitioners." *Laufenberg v. Cosmetology Examining Board,* 87 Wis. 2d 175, 184, 274 N.W.2d 618 (1979), citing *Watchmaking Examining Bd. v. Husar,* 49 Wis. 2d at 533. *See also, State ex rel. Green v. Clark,* 235 Wis. 628, 631, 294 N.W. 25 (1940). As this court noted in *Strigenz,* 103 Wis. 2d at 287, which dealt with licensing of dentists,

"When the professional license is issued to a dentist, the state assures the public of the competence of that person. As long as that person holds the dentistry license, the state of Wisconsin continues to assure the public of his or her competence as a dentist. The state does not rank nor rate the competence of the dentist but at the very least, the state does assure the public that the licensed dentist is competent to perform at a minimal standard as determined by others in the profession."

The purpose behind the delegating statutes, generally sec. 15.08(5) and, more specifically, ch. 448, is readily discernible. The purpose is to protect the public by insuring that those licensed to practice medicine in the State of Wisconsin are competent to do so under standards which have become accepted in the profession. This is apparent from the qualifications set forth in sec. 448.05, which must be met before the Board grants such a license.

The purpose behind sec. 448.18(1)(g), addressing the grounds for revocation by the Board, is also readily discernible. "Unprofessional conduct" is clearly defined as "detrimental to the best interests of the public." It is obvious that "detrimental to the best interests of the public" refers to the fact that the physician found to be engaging in unprofessional conduct no longer meets the purpose behind the requirement of licensing. In other words, the Board can no longer assure the public

that based upon its findings, the holder of the license is competent to practice medicine. Consequently, revocation of the privilege to practice medicine is the remedy permitted the Board.

We acknowledge that this is a broad grant of legislative power, since by its terms the Board is authorized to "define and enforce professional conduct and unethical practices not inconsistent with the law" concerning the practice of medicine. Section 15.08, Stats. *See also*, sec. 448.40, which empowers the Board to adopt rules under ch. 227 in order to effectuate the purpose of ch. 448. Defining and enforcing professional conduct necessarily entails disciplining those who do not meet these standards.

"This court, however, has emphasized that broad grants of legislative powers will be permitted where there are procedural and judicial safeguards against arbitrary, unreasonable or oppressive conduct of the agency." *State (Dept. of Admin.) v. ILHR Dept.*, 77 Wis. 2d 126, 135, 252 N.W.2d 353 (1977).

Therefore, we must now direct our attention to the procedural and judicial safeguards surrounding this grant of power to the Medical Examining Board.

We note that under sec. 448.02(3), Stats. 1975, the Board is empowered to "investigate allegations of unprofessional conduct." This statute is "hedged about with procedural safeguards." *Westring v. James*, 71 Wis. 2d at 468. Initially, there are intrinsic safeguards within the procedure the Board itself must follow upon receiving an allegation of unprofessional conduct. The Board must first investigate the allegation and, upon a finding of *probable cause* to believe that a person is guilty of such conduct, conduct a hearing before the Board prior to any action which may be taken concerning reprimand, suspension, etc. Thus, due process requirements are met. *See, Withrow v. Larkin*, 421 US 35 (1975). Fur-

ther, the Board is empowered to adopt rules concerning the procedures it will follow for such investigations and hearings pursuant to ch. 227, Stats. This court has already noted that a delegation of rule-making authority which is attended by the safeguards under ch. 227, Stats., requiring public hearings and the opportunity for the challenge of its rules in court, is a sufficient procedural safeguard. *State v. ILHR Dept.*, 77 Wis. 2d at 135.

Further, we find that sec. 448.09(2), Stats. 1975, provides that a party aggrieved by any Board action taken under ch. 448 may apply for judicial review as provided for in ch. 227. We cannot imagine any more stringent judicial safeguard against the exercise of "arbitrary, unreasonable or oppressive conduct" by the Board than such a provision allowing judicial review. Consequently, we find that the legislature has adequately stated the purpose of ch. 448 and sec. 15.08(5) and that the legislature's delegation of power is valid, because of the procedural safeguards and opportunity for court review as set forth in the chapter.

We also note that even under the earlier practice of focusing upon the language of the standard set forth in the statute, this court has approved similar statutes providing for the discipline of professionals. In *Strigenz v. Department of Regulation*, 103 Wis. 2d 281, this court addressed the authority of the Dentistry Examining Board as set forth under sec. 447.07(3), Stats. Section 447.07(5) allowed the Board to investigate and conduct hearings in response to allegations of "conduct unbecoming a professional person." This court held that such language referred to the fact that a dentist must "perform professionally in a minimally competent manner for his conduct to be becoming a professional person." *Id.* at 287. The court reached this conclusion by observing that because of the very nature of a licensing

statute, it is not necessary to specifically enunciate in a written rule that a professional must practice in a minimally competent manner. *Id.* at 286–87. This court, therefore, concluded that it was unnecessary that the Dental Examining Board utilize its statutory rule-making powers to promulgate further rules interpreting this statutory term of "conduct unbecoming a professional person." *Id.* at 285–86. *See also,* secs. 15.08 (5) (b), 227.-014, and 447.07, Stats. 1981–82. We also approved a similar standard in *Vivian v. Examining Board of Architects,* 61 Wis. 2d 627, 642, 213 N.W.2d 359 (1974), finding that "misconduct" is synonymous with "unprofessional conduct" and denotes conduct which through professional experience has become the standard of the profession.

In the instant case, the Medical Examining Board has promulgated a rule further interpreting the terms "unprofessional conduct" and "detrimental to the public interest" as utilized in sec. 448.18 (1) (g), Stats. This was set forth above in sec. Med. 16.02 (1) (g), Wis. Admin. Code.[6]

The Board has further interpreted these terms to mean conduct which tends to pose a "danger to the health, welfare, or safety of the patient. . . ." Section Med. 16.02 (1) (g), Wis. Admin. Code. Both the terms "danger" as utilized in the regulation and "detrimental" as utilized in the statute are derived from the standard of minimal competence which arises from the very nature of a licensing requirement. We may take judicial notice of the fact that many medical procedures involve associated risks and negative results. Therefore, we disagree

---

[6] We note that Professor Davis has suggested that should the legislature fail to provide a standard, the court should not find the delegation to be unlawful, but should require the agency to supply a standard as rapidly as possible. 1 Davis, *Administrative Law Treatise,* sec. 3:15 at 207. Therefore, had the legislature provided *no* standard, this would not automatically lead to an invalid delegation.

with the court of appeals' conclusion that each time a doctor undertakes to prescribe a treatment, he or she is guilty of conduct which tends to pose a danger to the health of the patient. This is because even though such risks and negative results are inherent in the nature of the practice of medicine, professionals within the field are aware of and accept these risks. *See,* sec. 448.30, Stats. 1981–82, which requires that a physician treating a patient must inform the patient of the availability of alternative methods of treatment and the benefits or risks of such alternative methods. The terms "danger" and "detrimental" refer to those risks and negative results which are unacceptable to other physicians and, therefore, demonstrate incompetence when measured against the standards which have become established in the medical profession.[7]

---

[7] We reject the court of appeals' conclusion that because the Board recently stated that it was prepared to promulgate an amendment to the present sec. Med. 10.02(2)(h), formerly sec. Med. 16.02(1)(g), Wis. Admin. Code, the Board itself has "recognized that sec. Med. 16.02(1)(g), Wis. Admin. Code stated a test that has little or no meaning." Sec. Med. 10.02(2)(h) would read as follows: "Any practice or conduct which tends to constitute a danger to the health, welfare, or safety of patient or public. Danger is defined as the risk created by conduct which falls below the minimum standards of the profession reasonably necessary for the protection of the patient or public." The Board has stated the following concerning the proposed amendment: "[It] clearly establishes that the required standard is the 'minimum standards of the profession,' rather than the so-called 'reasonable standard' criterion. Also, in defining the impermissible conduct as that falling below the minimum standards of the profession, concerns pertaining to disciplinary decisions based upon differences of professional opinion regarding medical techniques, or upon disputable benefit versus risk evaluations, are obviated. The standard recognizes that while all conduct comprising the practice of medicine involves risks, it is only those risks caused by conduct falling below the minimum standards of the profession which will be the subject of disciplinary action. Also, the standard,

Accordingly, we hold that the standard utilized by the legislature in sec. 448.18(1)(g), Stats., and further interpreted by the Board in sec. Med. 16.02(1)(g), Wis. Admin. Code, provides a standard for revocation sufficiently definite so that physicians should have no difficulty providing a standard of care which meets the requirement of professional conduct.

## II.

IS THERE SUFFICIENT EVIDENCE IN THE RECORD
TO SUPPORT THE BOARD'S FINDING THAT
DR. GILBERT'S ACTIONS EXHIBITED
UNPROFESSIONAL CONDUCT?

As we stated above, the Board's action of revoking Dr. Gilbert's license to practice medicine is reviewable under ch. 227, Stats. More particularly, we are concerned with the Board's application of sec. 448.18(1)(g), and sec. Med. 16.02(1)(g), Wis. Admin. Code, to the set of facts involved in this case. Such issues involve questions of law and are always reviewable by this court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d 396, 405, 291 N.W.2d 850 (1980); *Pabst v. Department of Taxation,* 19 Wis. 2d 313, 322, 120 N.W.2d 77 (1963). This court has often acknowledged that the appellate court's scope of review of an administrative board's action is identical to that of the circuit court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d at 405; *Scharping v. Johnson,* 32 Wis. 2d 383, 145 N.W.2d 691 (1966).

in clearly defining prohibited conduct as that falling below the minimum standards of the profession rather than that falling below some 'reasonable' standard, excludes disciplinary action based and dependent upon differences in expert opinion as to optimum or preferable medical techniques."

Under sec. 227.20(1), Stats. 1973,[8] the following standard applies when reviewing findings of fact:

"**227.20 Scope of review.** (1) The review shall be conducted by the court without a jury and shall be confined to the record . . . . The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

". . .

"(d) Unsupported by substantial evidence in view of the entire record as submitted . . . ."

Substantial evidence has been explained as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Bucyrus-Erie Co. v. ILHR Department,* 90 Wis. 2d 408, 418, 280 N.W.2d 142 (1979), citing *Bell v. Personnel Board,* 259 Wis. 602, 608, 49 N.W.2d 889 (1951).

When we review the record in the instant case, we must turn to the testimony of Dr. Martin Janssen in the hearing before hearing examiner David Beld. Dr. Janssen was appointed by the Board to act as the Board's independent medical consultant. Dr. Janssen testified that he had reviewed the documents and records in the Pfaff case, as well as depositions and transcripts from the earlier proceeding before the patients compensation panel. Initially, we observe, however, that pathologist Charles Dais, who performed the autopsy on Renee Pfaff, testified that she died from shock, secondary to blood loss. He also testified that he had observed that Pfaff's

[8] We find that sec. 227.20, Stats. 1973, applies, because the alleged unprofessional conduct by Gilbert occurred in 1975. Section 227.20(1), 1973, was repealed, sec. 227.20(2) was renumbered 227.20(10), and secs. 227.20(1)–(9) were created by secs. 23–25, ch. 414, Laws of 1975, effective in September of 1976, after the date of the doctor's treatment of Renee Pfaff.

spleen was ruptured and that she had sustained some damage to her lungs. The doctor characterized the lung injury, to a reasonable degree of medical certainty, as survivable. He also observed that the accident had fractured her femur but that blood loss from this injury "didn't kill" Pfaff. Dr. Dais concluded that the blood loss from the ruptured spleen alone was great enough in volume and rate of loss to have caused shock in Pfaff.

A. *Is the evidence sufficient to support the Board's conclusion that Gilbert's failure to visually assess Pfaff upon her arrival at St. Mary's constituted unprofessional conduct?*

As we noted above, unprofessional conduct refers to actions which do not exhibit minimal competence, and the terms "detrimental" and "danger" refer to unacceptable risks caused by a course of treatment, utilizing accepted medical standards.

When we review Dr. Janssen's testimony concerning his opinion of Pfaff's status when she arrived at St. Mary's emergency room, he testified that, in his professional judgment, Pfaff was "acutely and critically ill" at the time she arrived, seemingly suffering from shock. He further stated that she appeared to require "emergent care." When asked about the attending physician's immediate responsibility upon acquiring such a patient, Dr. Janssen responded that it would "normally" be to assess the patient's condition and to apply the needed emergency care and life support.

"That when someone would enter the emergency room hospital area who was in need of possible life support, and suffering from the effects of severe trauma, it would be in the best interests of the emergency care of that patient to have at least made some brief assessment of that patient's condition visually or by some other means, to establish how urgent the particular medical problem was that faced the other patient."

Dr. Janssen further stated that when Gilbert was told that Pfaff appeared to be "shocky," it would have been "proper" for him to examine her visually. He concluded that Gilbert's failure to visually assess Pfaff constituted a danger to her health, because the failure "delay[ed] the speed and adequacy of her care."

We do not find the evidence sufficient to support a finding of unprofessional conduct. Janssen testified that a visual assessment would have been "proper" and in the "best interests" of Pfaff. However, this language does not indicate that failure to visually assess Pfaff indicates incompetence. That a visual assessment would have been more "proper" indicates that Janssen would have made some visual assessment of Pfaff immediately. We find this situation to be analogous with negligence law. It is not the evidence that other physicians might have utilized a different treatment or procedure that proves negligence, but that " 'reasonable care and skill usually possessed by physicians of the same school' " was not exercised. *Francois v. Mokrohisky*, 67 Wis. 2d 196, 200–01, 226 N.W.2d 470 (1975) (citation omitted). Similarly, Janssen may not simply indicate that he would have utilized different measures. Rather, Janssen's testimony must unequivocally indicate that a minimally competent physician would have chosen a different course of treatment which would have avoided or minimized the unacceptable risks which the absence of a visual assessment entailed.

Janssen also testified that the failure to visually assess Pfaff delayed the speed and adequacy of her care. Once again, however, he does not indicate that this failure to look at Pfaff posed an *unacceptable risk* of danger to Pfaff, but merely that it posed a risk. We note that the delay amounted to approximately twenty-five minutes and that a nurse was instructed to begin an IV

during that time so that the care of Pfaff was not totally delayed. Therefore, we find that the record does not contain substantial evidence to support this conclusion.

B. *Is there substantial evidence to support the Board's conclusion that Gilbert's failure to provide timely and adequate treatment for Pfaff's low blood pressure and shock constitutes unprofessional conduct?*

Dr. Janssen stated that the appropriate treatment for shock is to reverse the effects of blood loss, both in terms of volume and speed. He was questioned regarding the critical period for the treatment of shock in injuries such as Pfaff's and testified that the first one and one-half to two hours would be the critical period. He testified that Gilbert's method of treating Pfaff's shock and blood pressure posed a danger to her health, "most particularly in the quality and quantity of the intravenous fluid replacement that was performed." According to Janssen, the five percent dextrose in water administered by Gilbert "is generally not considered a plasma expander or an appropriate fluid for the reversibility of blood loss shock." He recommended Ringer's lactate, Dextron, or plasma as a "more appropriate solution."

Once again, as we noted above, the fact that Janssen may have utilized a different solution to reverse Pfaff's shock does not meet the substantial evidence test. Instead, he must testify that the utilization of five percent dextrose in water posed an *unacceptable risk* to Pfaff and, thus, constituted incompetence.

Janssen was also questioned regarding Gilbert's use of a "cut-down," a procedure which surgically exposes a vein in order to insert plastic tubing into the vein. This permits a more rapid replacement of fluid when standard surface IV's do not prove to be effective in reversing shock.

Gilbert did not attempt to utilize a cut-down procedure until after 12:05 p.m. on September 27, 1975, even though Pfaff's condition of shock did not appear to be responding to the surface-line IV's. As we noted above, the original IV ordered by Gilbert was found to be "infiltrated," or running outside the vein, and, therefore, ineffective. Janssen testified as follows regarding the effectiveness of surface-line IV's and cut-downs:

"It's perfectly possible to place an intravenous in a surface line and have that be totally inadequate. It's possible to place two surface lines and have that be inadequate. It's possible to need not only one, but it's possible to need two cut-downs.

"The way this is determined is minute-by-minute, literally, recording and monitoring of the response of the person to that volume of fluid as it's being administered; and the response indicates the adequacy of the amount and volume and speed of replacement."

██ We find this testimony to be inconclusive. There is absolutely no indication that Gilbert's delay in utilizing a cut-down procedure posed an unacceptable risk to Pfaff or that his initial utilization of surface-line IV's demonstrated incompetence.

Dr. Janssen was further questioned concerning Gilbert's course of treatment of Pfaff, more specifically, Gilbert's request for an x-ray of Pfaff's fractured leg before administering the IV fluid of five percent dextrose in water. Janssen testified as follows:

"I believe that in the testimony there was the appearance of an obvious fracture of the femur, which under normal circumstances would not require that that be substantiated by the taking of an x-ray. If an x-ray were ordered it would have been more appropriate to order a chest x-ray. If the person was in deep shock and not responding it was probably more appropriate to not order an x-ray of either the chest or the femur

at that point, but to rather take more vigorous measures to restore blood circulation and blood pressure."

Dr. Janssen was also asked whether, to a reasonable degree of medical certainty, Gilbert's conduct in suturing Pfaff's lacerations before administering blood volume expanders or fluids other than five per cent dextrose and water tended to constitute a danger to the health, welfare, and safety of Renee Pfaff. Dr. Janssen answered,

"A I do have an opinion, and I believe in my professional judgment that did constitute a danger to Renee Pfaff.
"Q In what respect?
"A That I believe this was a misplacement of priorities, in the sense that until this patient had had the conditions that were life threatening, namely that of shock, at least to be under the control to a sufficient degree so that her vital signs were stable, that deviating his attention to the repair of lacerations of any kind would probably be of a fairly low priority item unless those lacerations were having relationship to the blood loss involved in that shocklike picture at the moment, such as clamping a large blood vessel or something of that sort."

He also testified that had Pfaff's shock been treated more properly and utilizing the methods which he had suggested, "then reversibility of shock would have been better," and "her condition would have been more favorable."

Once again, we do not find substantial evidence in the record to support the Board's conclusion concerning Gilbert's unprofessional conduct. That more aggressive measures to restore blood circulation and blood pressure were "probably more appropriate" do not indicate that Gilbert's treatment constituted incompetence or presented unacceptable risks to Pfaff's health. It instead dem-

onstrates that Janssen would have utilized an alternative mode of treatment. As we have stated previously, Janssen's testimony must unequivocally demonstrate that a minimally competent physician would have utilized methods different from those Gilbert utilized, in order to avoid articulable, unacceptable risks his treatment is alleged to have caused.

C. *Does the record support the Board's conclusion that Gilbert's failure to provide timely and adequate management of Pfaff's perceived severe abdominal injury constitutes unprofessional conduct?*

Dr. Janssen testified concerning the possibility of diagnosing Pfaff's ruptured spleen, which he concluded was the primary source of blood loss. (As we noted above, Dr. Dais concluded that Pfaff died from shock, secondary to blood loss.) Dr. Janssen testified that the blood from the spleen collected in the abdominal cavity and could be detected through utilization of "abdominal taps." Dr. Gilbert utilized a "two-position abdominal tap," rather than what Dr. Janssen characterized as a commonly used "four-quadrant tap." However, Janssen found the use of the two-position tap to be "proper." Concerning Gilbert's failure to locate "free blood" and, thus, diagnose the ruptured spleen, Janssen responded,

"It is possible for an abdominal tap to be falsely negative. That means one can do an abdominal tap properly and produce negative results even though there is blood in the abdominal cavity.
"The fact that it was done, I think, is proper. The fact that it did not produce any noticeable yield of positive results is something that does occur on occasion."

Janssen also testified that a rigid, board-like abdomen, which Pfaff exhibited, implies that the peritoneum is irritated. He indicated that this "could be caused by free blood."

When we review this testimony, we find that it does not contain substantial evidence to support the Board's conclusion that Gilbert's failure to manage the abdominal injury constituted unprofessional conduct. Initially, it is not even clear that Gilbert could have confirmed his suspicions regarding the existence of the ruptured spleen, since Dr. Janssen stated that his use of the particular abdominal taps was "proper," and the fact that they yielded negative results is inconclusive, since this does occur. Further, Pfaff's rigid abdomen "could" have implied the abdominal injury. However, Dr. Janssen's testimony is insufficient regarding whether or not a minimally competent physician would have undertaken treatment different from that utilized by Gilbert, in order to treat the possibility of such an injury based upon the rigidness of the abdomen alone. For example, Janssen indicated that surgical removal of the spleen is a possibility. However, the record does not indicate whether a minimally competent physician would have attempted surgical removal of the spleen based solely upon the observation of the rigid state of Pfaff's abdomen after the abdominal taps had yielded no free blood.

Further, Janssen testified that had Gilbert diagnosed the ruptured spleen, he would have utilized the same treatment Janssen recommended for shock, namely, replacement of fluid loss both in terms of speed and volume. As noted above, Janssen's testimony did not indicate that Gilbert's attempt to replace fluid, through the use of surface IV's and cut-downs, demonstrated incompetence. Similarly, we cannot conclude from the record that his treatment of the abdominal injury, as he perceived it, constituted unprofessional conduct.

D. *Does the record support the Board's conclusion that Gilbert's failure to institute rapid, timely resuscita-*

*tion and to effect an early transfer to another treating
facility constitutes unprofessional conduct?*

Dr. Janssen testified that had the methods he suggested for reversal of shock been utilized by Dr. Gilbert, Pfaff's condition would have been "more favorable, even though this cannot be a medical certainty." He was also questioned concerning the necessity of transferring a patient with injuries of a severity similar to Pfaff's, due to the limitations of a smaller hospital. Dr. Janssen answered,

"In a small hospital of any sort in a rural community, whenever you have an emergency patient present, one must always interpret to one's satisfaction whether those conditions can be managed appropriately and primarily at that location. Secondly, whether those conditions can only be stabilized, and the patient transferred to another location."

It appears from Dr. Janssen's testimony that transfer is dependent upon stabilization of the patient, if one determines that the present facility is inadequate. However, Janssen had stated previously that Pfaff's medical records revealed that at no time during the first several hours was her blood pressure sufficiently high enough to be called "adequately controlled." Therefore, it appears that Gilbert may not have been able to transfer Pfaff, although the record indicates that he had plans to do so, based upon the fact that he was unable to control Pfaff's blood pressure.

Janssen was also questioned regarding the hospital's staffing, equipment and lighting inadequacies, and whether Dr. Gilbert should have transferred Pfaff to a better-equipped facility.

"In my judgment that would be one factor that would enter into the mind of the physician that would determine or make him believe that he might want to transfer the patient sooner rather than later. That entering

into that whole complexity of what one uses to deter-
mine the safety and speed of transferring a patient,
one's own facilities have to be kept in mind and used
as part of a judgment decision."

Once again, we find this testimony insufficient to
support the Board's conclusion that failure to transfer
Pfaff constituted unprofessional conduct. The gist of
Janssen's testimony is that St. Mary's facilities may have
led Gilbert to believe that he "might" have wanted to
transfer Pfaff. However, there is no indication that
Gilbert's failure to transfer Pfaff demonstrates incom-
petence or that his failure to do so posed unacceptable
risks to Pfaff's health which a minimally competent
physician would have avoided. Accordingly, we find the
record does not contain substantial evidence to support
this conclusion.

We realize that the inconclusiveness of Janssen's tes-
timony may partially be due to the fact that even had
Pfaff received the treatment he had suggested, she may
not have survived. Janssen acknowledged this in his
testimony, stating,

"Given the situation that had her shock picture been
reversed at an earlier time, then I believe her condition
would have been more favorable and would have affected
her outcome, even though this cannot be a medical cer-
tainty."

However, in order for the Board to find that Gilbert's
action constituted unprofessional conduct, there must
be testimony to the effect that a minimally competent
physician would have avoided or minimized the unac-
ceptable risks which Gilbert's treatment posed, in spite
of the fact that Pfaff may not have survived with this
proper treatment. The Board may have utilized its

expertise in the field of medicine to bridge the gaps left by Janssen's testimony. However, as the court of appeals correctly noted, the Board cannot rely on the expert knowledge of its members to make such inferences from inconclusive testimony. Its actions must be based only upon the record before it. The Board may not substitute its knowledge for evidence which is lacking. 73 C.J.S. *Public Administrative Bodies and Procedure*, sec. 123 at 443 (1951). Similarly, because of our lack of expertise in the medical field, we cannot draw inferences from the record as to how a minimally competent physician would have proceeded, based upon Gilbert's observations and Janssen's testimony concerning what these observations *might* possibly indicate. We must, therefore, remand this case to the Board for further proceedings regarding what treatment a minimally competent physician would have utilized and whether Gilbert's treatment posed unacceptable risks that a minimally competent physician would have avoided or minimized.

In summary, then, we hold that the delegation of legislative authority to the Medical Examining Board was valid, due to the ascertainable legislative purpose and procedural safeguards as contained in the statutes. We further find the standard concerning "unprofessional conduct" as set forth in sec. 448.18(1)(g), Stats., and further interpreted by sec. Med. 16.02(1)(g), Wis. Admin. Code, to be sufficiently definite to denote conduct which does not meet the level of minimal competence accepted in the field and poses unacceptable risks to the patient's health. We also hold that the record does not contain substantial evidence to support the Board's finding that Dr. Gilbert demonstrated unprofessional conduct in his treatment of Renee Pfaff, and, therefore, we remand the cause to the Medical Examining Board for further proceedings consistent with this opinion.

208

*By the Court.*—The decision of the court of appeals is reversed; the order of the circuit court is affirmed in part and reversed in part; and the cause is remanded to the Medical Examining Board for further proceedings consistent with this opinion.

HEFFERNAN, C.J., took no part.