Kathleen HACKER, Petitioner-Appellant,†

v.

State of Wisconsin DEPARTMENT OF HEALTH & SOCIAL SERVICES, Respondent-Respondent.

Court of Appeals

*No. 93–1043. Submitted on briefs November 8, 1994.—Decided November 17, 1994*

(Also reported in 525 N.W.2d 364.)

†Petition to review granted.

For the petitioner-appellant the cause was submitted on the briefs of *Robert M. Hesslink, Jr.* and *Natalie M. King* of *Hesslink Law Offices, S.C.* of Verona.

For the respondent-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Gerald S. Wilcox*, assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

DYKMAN, J.   Kathleen Hacker appeals from an order affirming a decision of the Department of Health and Social Services (DHSS) authorizing revocation of the operating licenses for two community-based residential facilities (CBRFs), Shannon Home and Harbor Inn. Hacker, a registered nurse, is the owner and operator of both CBRFs.

Hacker asserts that DHSS used an incorrect legal standard to revoke her licenses, and that the standard used is unconstitutionally vague. She attacks certain findings of DHSS as unsupported by substantial evi-

dence. She also claims that revocation of her licenses is an inappropriate sanction. We find no error and affirm.

## STANDARD OF REVIEW

Though DHSS interpreted a variety of rules and statutes in its decision authorizing revocation of Hacker's CBRF licenses, we will first consider whether § 50.01(1g), STATS., permits Hacker to perform in-house nursing services for her CBRF residents.[1] Section 50.01(1g), which we later quote, defines a CBRF as a place where personal care, but not nursing services, is provided. DHSS has experience in revoking and modifying CBRF licenses. *See In re Oakwood Acres Residential Facility*, No. 90-OAH-523 (DHSS 1990); *In re James Masters*, No. 84-OAH-75 (DHSS 1985); *In re Underwood CBRF*, No. 83-OAH-29 (DHSS 1984). But neither Hacker nor DHSS cites any cases before DHSS or courts which assist in determining the scope of § 50.01(1g). In *Jicha v. DILHR*, 169 Wis. 2d 284, 290-91, 485 N.W.2d 256, 258-59 (1992), the court noted that we would review an agency's interpretation of a statute *de novo* if the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented. While many of the issues in this case are within DHSS's special expertise or experience, the scope of § 50.01(1g) is not. This is an issue of first impression. We are as well equipped to decide the meaning of that statute as DHSS. We conclude that our scope of review of this question is *de novo*.

---

[1] *See infra* note 4.

## ERRONEOUS LEGAL STANDARD

Hacker argues that DHSS applied an erroneous legal standard when it concluded that Hacker failed to obtain prior physician approval for rectal examinations, enemas, bowel impaction removals and high doses of milk of magnesia. These were DHSS's factual findings which supported its conclusion that Hacker violated § 50.09(1)(L), STATS., which provides that every CBRF resident has the right to receive adequate and appropriate care within the capacity of the facility.

The crux of Hacker's argument is that providing ordinary nursing services in a CBRF does not violate any statute or rule unless the quantity of those services exceeds seven hours per week. She develops this argument from her reading of § 50.01(1g) and (3), STATS. Those statutes provide in relevant part:

> (1g)  "Community-based residential facility" means a place where 5 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility . . . .
>
> . . . .
>
> (3)  "Nursing home" means a place which provides 24-hour services including board and room to 3 or more unrelated residents who because of their mental or physical condition require nursing care or personal care in excess of 7 hours a week.

Hacker contends that because nursing home care is not available unless the resident needs at least seven hours of nursing care per week, CBRFs must be able to perform up to seven hours per week of nursing care. There is no dispute that Hacker's CBRF residents do not receive that much nursing care. Hacker concludes

that because she is a registered nurse, she violated no statute or rule by performing the rectal examinations, removing the bowel obstructions, giving enemas and by administering milk of magnesia.

Hacker's analysis founders because § 50.01(1g), STATS., defines a CBRF as a place where *no* nursing care is provided to residents.[2] By doing so, the statute

[2] We note that we are not the first to read § 50.01(1g), STATS., in this way. On December 1, 1992, DHSS sent a proposed rule to the Wisconsin Legislative Council for review, pursuant to § 227.15(1), STATS. The DHSS analysis of the pertinent part of the proposed rule noted: "Community-based residential facilities, sometimes called group homes for adults, are homes for [5] or more adults who need supervision, care and services besides board and room *but not much if any nursing care.*" (Emphasis added.) The proposed rule provided in pertinent part:

HSS 83.03 *MEANING OF COMMUNITY-BASED RESIDEN-TIAL. FACILITY.* (1) INCLUDED RESIDENTIAL FACILITIES. (a) In this chapter, "community based residential facility" or "CBRF", is a place where 5 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care *for more than 7 hours a week per resident* are provided to them as a primary function of the facility ....

(Emphasis added.)

On January 4, 1993, the Legislative Council submitted its response to DHSS. The report read in pertinent part:

*1. Statutory Authority*
    a. The definition of community-based residential facility (CBRF) in the rule refers to a place where care, treatment or services above the level of room and board are provided, but not including nursing care for *more than seven hours a week* per resident. Also, [DHSS's] analysis to the rule states that residents of CBRF's need "not much if any" nursing care. The statutory definition of CBRF, in s. 50.01(1g), Stats., appears to restrict CBRF's to providing care, treatment or services above the level of room and

332

prohibits the very acts that Hacker claims she is entitled to perform, at least on the premises of a CBRF.[3] Section 50.01(1g) must be read as if commas were placed before and after the phrase, "but not including nursing care." The phrase, "as a primary function of the facility," modifies the clause, "a place where five or more unrelated adults reside in which care, treatment or services above the level of room and board . . . are provided." It does not modify the phrase, "but not

board *but not including* nursing care. Therefore, this provision of the rule, and other related provisions, appear to be in conflict with the statutory definition of CBRF.

Prior to DHSS's proposed rules, the Legislative Council introduced 1991 A.B. 685. That bill provided in pertinent part:

SECTION 4.   50.01 (1g) (intro.) of the statutes is amended to read: 50.01 (1g) (intro.) "Community-based residential facility" means a place where ~~3~~ 5 or more unrelated adults reside in which care, treatment or services above the level of room and board ~~but not including nursing care~~, *including not more than 7 hours of nursing care per person per week*, are provided . . . .

NOTE:   1. . . . 2.   Allows for the provision of limited nursing care to residents, up to seven hours per week per resident.

1991 A.B. 685 was referred to the Committee on Housing, where it died.

We recognize that competing inferences may be drawn from failed legislation or not-yet-enacted administrative rules. We note this material only in response to DHSS's assertion that there is little to support a conclusion that no nursing care can be provided in a CBRF. The plain meaning of the statute, also recognized by the Legislative Council, supports our conclusion. So does WIS. ADM. CODE § HSS 3.04(2)(a), set out in n.4, *infra*.

[3] Hacker's argument also fails because, contrary to her assertions, nursing homes are not limited to individuals who need more than seven hours of nursing care per week. The language of § 50.01(3), STATS., makes it clear that nursing homes are also available to individuals who need more than seven hours of personal care each week.

including nursing care." The statute is unambiguous. Nursing care may not be provided by a CBRF licensee. A CBRF licensee may provide care, treatment or services above the level of room and board, but not nursing care.[4] Residents of CBRFs needing nursing services must obtain them from home health services, nursing homes, clinics or hospitals.

Our interpretation of § 50.01(1g), STATS., makes it unnecessary for us to address DHSS's argument that Hacker could perform nursing services in her CBRFs, but only with a doctor's written authorization. And we need not consider Hacker's assertion that accepting DHSS's argument would render the statute void for vagueness. We have not accepted that argument.

---

[4] WISCONSIN ADM. CODE § HSS 3.04(2)(a) defines "[c]are, treatment or services above the level of room and board but less than nursing care":

> Care, treatment or services above the level of room and board but less than nursing care means supervision and supportive services provided to persons who have needs which cause them to be unable to live independently in the community, but who do not require nursing home services. Supportive services may include but are not limited to the following services, as defined in these rules:
> 1. Information and referral.
> 2. Leisure time services.
> 3. Vocational services.
> 4. Transitional services.
> 6. Personal care.
> 7. Health monitoring and arrangement for health-related services.
> 8. Counseling services.

"Personal care" is defined in § 50.01(4o), STATS.:

> "Personal care" means assistance with the activities of daily living, such as eating, dressing, bathing and ambulation.

## UNSUPPORTED FINDINGS

Section 227.57(6), STATS., provides that where an administrative agency has made a finding of fact in a contested case, a court may reverse if the finding is not supported by substantial evidence. Hacker asserts that findings as to the four incidents which DHSS used as the basis to revoke her licenses were not supported by substantial evidence. The incidents are:

(1)  On March 22 or 24, 1991, Hacker gave milk of magnesia to a resident in an amount allegedly exceeding a physician's order. The resident experienced diarrhea and the physician was not called. Hacker also administered a water enema to the resident.

(2)  Between May 1 and August 28, 1991, Hacker removed a bowel impaction from another resident without a physician's order.

(3)  In May 1991, Hacker gave an enema and removed a bowel impaction without a physician's order.

(4)  An incident in which Hacker yelled at a resident.

## MARCH 22 OR 24, 1991 INCIDENT

Hacker admits that the incident occurred. But she asserts that there is no evidence of an overdose of a laxative. We have concluded that providing *any* nursing service, such as administering laxatives, enemas and removal of bowel impactions to a resident, is not permitted in a CBRF. Therefore, Hacker's concession that she administered laxatives and enemas and did bowel impaction removals provides the necessary evidence. And, Eleanor Sprague testified that she administered three ounces of milk of magnesia, after being asked to do so by Hacker, and did not call a

335

physician. Dr. Rentmeester's office records showed no telephone call.[5] That is sufficient evidence to support a finding that no physician was called. Had Hacker wished to dispute Sprague's testimony, or the accuracy of the physician's records, she could have done so.

Hacker argues that there is no evidence that three ounces of milk of magnesia exceeds a prescribed dosage. But a hospital discharge summary showed a dosage of milk of magnesia of thirty cubic centimeters (cc's) (about an ounce), once a day as needed. And a registered nurse testified that the milk of magnesia bottle label permitted fifteen cc's, or one-half ounce, once a day if the patient needed it. She also testified that giving an ounce at three different times would have exceeded the physician's order. This evidence is sufficient to meet the requirement of § 227.57(6), STATS., that an agency's findings of fact must be supported by substantial evidence.

## MAY-AUGUST 1991 INCIDENT

The examiner found that on one occasion between May 1, 1991, and August 28, 1991, Hacker conducted either a rectal exam or an impaction removal by covering her hand with a baggie, lubricating the baggie with Crisco from a can in the kitchen used in food preparation, and inserting her bagged fingers in a resident's rectum. Hacker argues only that there is no evidence that this was done without a doctor's order. We have already concluded that a procedure such as this may not be performed in a CBRF. And we agree with DHSS that Hacker's use of Crisco potentially contaminated with food particles violated § 50.09(1)(L), STATS., which gives CBRF residents the right to receive adequate and

---

[5] Dr. Rentmeester is the resident's physician.

appropriate care within the capacity of the facility. Even if a rectal exam or bowel impaction were ordered by a physician, Hacker's method of doing so provides the evidence to support DHSS's finding that Hacker violated § 50.09(1)(L).

## MAY 1991 INCIDENT

Hacker's brief describes this incident as a procedure allegedly done without a doctor's order. But DHSS's revocation letter asserts a violation of § 50.09(1)(L), STATS., in May 1991, because Hacker failed to give a resident adequate and appropriate care. The testimony supporting this incident again came from Eleanor Sprague. She testified:

> Well, this was again a time that Gert was impacted. Kathy told me that she was impacted and she wanted to insert her fingers up into her rectum to see if she could break the stool up. And she would do this often and she inserted her fingers into Gert's rectum as she stood in front of the stool in the bathroom bent over and when Kathy removed her fingers, her fingers was full of stool and blood. And we also, at that time, we both pressed on her stomach before she went up into her rectum.

We have already concluded that this sort of procedure may not be done in a CBRF. Performing either a rectal examination or a bowel impaction removal in a CBRF violates § 50.09(1)(L), STATS. The testimony we have excerpted is substantial evidence supporting DHSS's conclusion that this violation occurred.

## DISCOURTEOUS TREATMENT OF RESIDENTS

Hacker asserts that DHSS failed to establish a sufficient basis for believing that she violated a resi-

337

dent's rights. The examiner found that on two occasions, Hacker "yelled" at a resident, violating § 50.09(1)(e), STATS. That statute gives residents of CBRFs the right to be treated with courtesy, respect and full recognition of the resident's dignity and individuality. Hacker's assertion asks that we accept her version of the incidents. She contends that she "discussed" a matter with a resident. She also gives as a justification for the incident that the resident was misbehaving. Hacker also suggests that we should discount evidence that Hacker's actions caused the resident to cry because the resident was manipulative and could cry at will.

Hacker misperceives the nature of appellate review of administrative decisions. We do not weigh evidence or consider alternative explanations for witnesses' testimony. We do not consider what result we might reach were we to consider the evidence *de novo*. We examine a record to determine whether an agency's conclusion is supported by substantial evidence. Again, that evidence was supplied by Eleanor Sprague. Sprague testified that Hacker told a resident that the resident was a "troublemaker," and that if she did not stop "badmouthing" the CBRF, "she could take her clothes and leave." Sprague testified:

Q: You're hearing Kathy Hacker say at the time to [the resident]?

A: Right and I am right—standing right beside Kathy and she really—she yelled very loud at her.

Q: And called her a troublemaker?

A: And a liar and that's the way it was.

338

Another witness testified about Hacker's treatment of the same resident on another occasion:

Q: What is it that you observed or what did you see?

A: ... Kathy went in and start[ed] yelling at her about her behavior there and telling her she was crazy and that if she didn't like it, if she made any more trouble, she could pack her bags and get out. She didn't care where she had to go but she was to get out if she made any more trouble.

We accept the witnesses' testimony. Section 227.57(6), STATS. We may not accept Hacker's assertion that this was only a "discussion," or her assertion that "yelling" at a resident was necessitated by the resident's misbehavior. Section 50.09(1)(e), STATS., makes no exception in the case of resident misbehavior. We need only decide whether Hacker's actions violate the statutory right given to CBRF residents to be treated with courtesy, respect and full recognition of their dignity and individuality. We have no difficulty concluding that they do. That is the extent of our review.

## ADEQUATE NOTICE OF ISSUES

Hacker argues that DHSS's notice of intent to revoke her CBRF licenses did not give her adequate notice of the factual or legal bases for its actions. She cites *Estate of Wolff v. Town Bd. of Weston*, 156 Wis. 2d 588, 457 N.W.2d 510 (Ct. App. 1990), as authority for her assertion that notice must be sufficient to enable the recipient to determine what he or she must do to defend against the charge. We agree that when the

339

state attempts to deprive an individual of a protected right, adequate notice must be given.

Hacker's argument is, in reality, an assertion that the DHSS hearing examiner could not mention or cite statutes or rules not found in DHSS's notice of intent to revoke. That argument goes beyond the holding of *Wolff.*

The notice of intent to revoke cited the following statutes and rule as the basis for its conclusion that Hacker's licenses should be revoked:

(1)    The March 22 or 24, 1991 incident—§ 50.09(1)(L), STATS.

(2)    The May 1 - August 28, 1991 incident—HSS 50.09(1)(L), STATS.[6]

(3)    The May 1991 incident—§ 50.09(1)(L), STATS.

(4)    The "yelling" incidents—§ 50.09(1)(a), STATS.,[7] and WIS. ADM. CODE § HSS 3.31(1)(a).

Hacker complains that § 50.01(1g), STATS., which provides the definition of a CBRF, was not cited in the notice of revocation. But that is not necessary. Section 50.03(5)(b), STATS., provides only that a notice of revocation must "include a clear and concise statement of

---

[6] Hacker does not attack the obvious typographical error in this part of the notice.

[7] Although the notice of intent to revoke and the hearing examiner's decision refer to para. (a) of § 50.09(1), STATS., rather than para. (e), both documents correctly cite para. (e) when referring to separate incidents in which residents were not treated with courtesy, respect and full recognition of their dignity. We conclude that Hacker could not have been prejudiced by this clerical error which she does not discuss in her briefs.

the violations on which the . . . revocation is based, the statute or rule violated and notice of the opportunity for an evidentiary hearing . . . ." Section 50.09(1)(L), STATS., is the statute upon which the first three incidents were based. Section 50.09(1)(e) is the statute upon which the fourth incident was based. Those were the statutes the DHSS hearing examiner found to have been violated. Other statutes and rules may have assisted the examiner in determining whether the stated statutes were violated, but § 50.03(5)(b) requires only a citation to the statute violated. DHSS did that.

## ADEQUATE NOTICE—II

Hacker asserts that the hearing examiner's finding that the March 22 or 24, 1991 event "occurred, but not on the dates alleged," deprived her of adequate notice of the charges against her. She argues that she provided an "alibi-type" defense to the charges, and that changing dates after the hearing deprived her of adequate notice of the charges. We do not accept this argument.

Hacker knew the charges against her. She denied that she *ever* exceeded the doctor's orders for milk of magnesia for *any* resident. She admitted doing anal impaction checks and recalled doing one when Eleanor Sprague was present. The exact date of the March 22 or 24 event was irrelevant. And Hacker was permitted to show that Sprague's testimony was suspect because Sprague did not remember the date the excessive doses of milk of magnesia were administered. The examiner accepted Hacker's argument that the incident did not occur when Sprague believed it occurred, but that was not a finding that the incident did not occur. Hacker's reliance on *Schramek v. Bohren*, 145 Wis. 2d 695, 704,

429 N.W.2d 501, 504 (Ct. App. 1988), is misplaced. *Schramek* holds that adequate notice must be given before the state is permitted to affect the rights of a person. We did not hold that it is necessary to allege or prove that an incident occurred on a particular date. Hacker does not attack the specificity of the allegation that she gave an overdose of milk of magnesia and an enema to a particular resident and the graphic details alleged to be the result of the treatment. We conclude that DHSS gave Hacker adequate notice of the charges involved in the March 22 or 24 incident.

## EXCESSIVE SANCTION

Hacker correctly notes that she was charged with many violations of statutes and rules pertaining to CBRFs, but that she was found to have violated them on only four occasions. She observes that the bureau director of DHSS selected license revocation as a penalty prior to the examiner's hearing because of the totality of the allegations made. She concludes that since the substantial majority of DHSS's allegations were ultimately unproven, license revocation was unduly severe.

We disagree. While Hacker's facts are correct, she neglects to note that the examiner concluded that Hacker substantially violated § 50.09(1)(L), STATS., on three occasions and § 50.09(1)(e) on one occasion. The examiner then ordered: "The Department may revoke the community-based residential facility licenses of [Hacker]." Thus, after hearing the evidence and finding that only four of the many allegations of statutory violations were proven, the examiner still concluded that license revocation was appropriate.

■

We are not to second-guess administrative agencies' discretionary acts. Section 227.57(8), STATS., provides:

> The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice . . . but the court shall not substitute its judgment for that of the agency on an issue of discretion.

License revocation is within the range of powers delegated to DHSS. Section 50.03(5), STATS. Hacker has pointed to no rule, policy or practice with which revocation of her licenses is inconsistent. Even if we were permitted a *de novo* review of DHSS's decision to revoke Hacker's licenses, we could not say that the proven violations were insignificant, or that DHSS's revocation decision was an overreaction to the proven violations. Under the limited scope permitted us by § 227.57(8), STATS., we conclude that we may not interfere in DHSS's decision to revoke Hacker's licenses.

*By the Court.*—Order affirmed.