Kathleen HACKER, Petitioner-Appellant-Petitioner,

v.

STATE OF WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Respondent-Respondent.

Supreme Court

*No. 93–1043. Oral argument October 3, 1995.—Decided December 21, 1995.*

(Also reported in 541 N.W.2d 766.)

441

443

444

445

For the petitioner-appellant-petitioner there were briefs by *Robert M. Hesslink, Jr., Natalie M. King* and *Hesslink Law Offices, S.C.,* Verona and oral argument by *Robert M. Hesslink.*

For the respondent-respondent the cause was argued by *Gerald S. Wilcox,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

ROLAND B. DAY, C.J.  Petitioner Kathleen Hacker seeks review of a published decision of the court of appeals, *Hacker v. DHSS,* 189 Wis. 2d 328, 525 N.W.2d 364 (Ct. App. 1994), which affirmed an order of the Circuit Court for Dodge County, Joseph E. Schultz, Judge, affirming a decision of the Department of Health and Social Services (DHSS) authorizing revocation of Ms. Hacker's operating licenses for two community-based residential facilities (CBRFs). Ms. Hacker raises five issues on this review: (1) whether the court of appeals decision erred in interpreting Wis.

Stat. § 50.01(1g) (1991-92)[1] as not allowing for any nursing care to be provided at a CBRF; (2) whether DHSS violated Wis. Stat. § 50.03(5)(b) (1993-94)[2] or Ms. Hacker's due process rights in failing to provide an adequate notice of revocation; (3) whether substantial evidence in the record supports the hearing examiner's factual findings of violations of chapter 50 of the Wisconsin Statutes and chapter HSS 3 of the Wisconsin Administrative Code, characterized by the examiner as substantial; (4) whether the hearing examiner erroneously concluded that nursing services may not be performed in a CBRF without a physician's written order, either direct or standing; and (5) whether DHSS's decision to revoke Ms. Hacker's licenses constituted an abuse of discretion. We reverse the decision of the court of appeals revoking Ms. Hacker's licenses and remand to DHSS for a determination of alternative sanctions. We also disagree with the conclusion of the court of appeals that no nursing services may be provided in a CBRF. However, we agree with the court of appeals that Ms. Hacker was provided sufficient notice and that substantial evidence in the record supports the hearing examiner's conclusion that Ms. Hacker substantially violated chapter 50 of the Wisconsin

---

[1] Section 50.01(1g) provides in relevant part:

 (1g) "Community-based residential facility" means a place where 3 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility. . . .

[2] Section 50.03(5)(b) provides:

 (b) *Form of notice.* Notice under this subsection shall include a clear and concise statement of the violations on which the nonrenewal or revocation is based, the statute or rule violated and notice of the opportunity for an evidentiary hearing under par. (c).

Statutes and chapter HSS 3 of the Wisconsin Administrative Code.

The underlying facts in this case are as follows; additional facts will be noted as necessary throughout this opinion. Kathleen Hacker, a registered nurse, is the licensee and manager of two CBRFs, the Harbor Inn facility in Horicon, Wisconsin, and the Shannon Home facility in Juneau, Wisconsin. On September 17, 1991, DHSS issued a notice of revocation for Ms. Hacker's licenses at Harbor Inn and Shannon Home. On September 23, 1991, Ms. Hacker made a request for an administrative hearing on the revocation. DHSS issued a second notice of revocation on October 30, 1991,[3] which modified some of the factual allegations made in its first notice of revocation, deleted one charge, and added another. In the second notice of revocation, DHSS charged Ms. Hacker with twenty-one code violations.

After hearings on December 6, 9, 10, and 12, 1991, a DHSS hearing examiner issued a written decision on February 10, 1992. The examiner found four violations of Wis. Stat. § 50.09(1)(e) & (L) (1993-94),[4] which it described under "Conclusions of Law" as follows:

---

[3] DHSS' second notice of revocation is dated October 29 on its first page; however, the second and subsequent pages, as well as an accompanying cover letter, are dated October 30. This opinion will refer to this letter as the October 30 revocation letter for purposes of clarity.

[4] That section provides:

    **50.09 Rights of Residents in certain facilities.**
    **(1)** RESIDENTS' RIGHTS. Every resident in a nursing home or community-based residential facility shall . . . have the right to:

    . . . .

    (e) Be treated with courtesy, respect and full recognition of the resident's dignity and individuality, by all employes of the

1. The licensee [Ms. Hacker] has substantially violated 50.09(1)(L), Wis. Stats., by directing a staff person to administer Milk of Magnesia to a resident of Shannon Home in a dosage which exceeds physician's orders.
2. The licensee has substantially violated 50.09(1)(L), Wis. Stats., by performing rectal examinations, giving an enema, and removing a bowel impaction without a written order from the physicians for two residents, one at Harbor Inn and one at Shannon Home.
3. The licensee has substantially violated 50.09(1)(L), Wis. Stats., by failing to inform the residents' physicians of the medical condition of the residents in conclusion of law 2.
4. The licensee has substantially violated 50.09(1)(e), Wis. Stats., by yelling at [a resident] at Shannon Home and calling [the resident] names.

The hearing examiner found the other seventeen code violations DHSS alleged to be unsupported by the evidence. The hearing examiner ruled that DHSS could revoke the CBRF licenses of Shannon Home and Harbor Inn. On April 9, 1992, DHSS adopted the February 10, 1992 decision of the hearing examiner as its final decision.

Ms. Hacker sought judicial review of DHSS's decision. The Circuit Court for Dodge County, the Honorable Joseph E. Schultz, affirmed DHSS's order. Ms. Hacker appealed, and the court of appeals affirmed. The court of appeals held that Ms. Hacker had been in violation of Chapter 50 of the Wisconsin

---

facility and licensed, certified or registered providers of health care and pharmacists with whom the resident comes into contact.

....

(L) Receive adequate and appropriate care within the capacity of the facility.

Statutes by providing nursing services at a CBRF; according to the court of appeals, the unambiguous language of § 50.01(1g) did not permit any nursing services to be performed at a CBRF. The court of appeals also held that DHSS's findings were supported by substantial evidence, and that the revocation of Ms. Hacker's CBRF licenses was an appropriate penalty.

■

We first consider whether the court of appeals erred in concluding that § 50.01(1g) forbids providing any nursing services at a CBRF. The interpretation of a statute presents a question of law which this court reviews de novo. *Ball v. District No. 4 Area Bd.*. 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). Our methodology in interpreting statutory language is stated in *In re Termination of Parental Rights to SueAnn A.M.*, 176 Wis. 2d 673, 678, 500 N.W.2d 649 (1993) (quoting *In Interest of P.A.K.*, 119 Wis. 2d 871, 878-79, 350 N.W.2d 677 (1984) (citations omitted)):

> The purpose of statutory interpretation is to ascertain and give effect to the legislature's intent. In determining the legislative intent, first resort is to the language of the statute itself. If the meaning of the statute is clear on its face, this court will not look outside the statute in applying it. If the statutory language is ambiguous, this court attempts to ascertain the legislature's intent by the scope, history, context, subject matter and object of the statute. A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in either two or more senses.

Wisconsin Stat. § 50.01(1g) provides in relevant part:

> (1g)  "Community-based residential facility" means a place where 3 or more unrelated adults

reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility. . . .

Both Ms. Hacker and DHSS argue that the phrase "but not including nursing care" is modified by the phrase "as a primary function of the facility," with the result that the statute allows some amount of nursing care to be provided in a CBRF. This interpretation of the statute was shared by the hearing examiner in the instant case. DHSS and Ms. Hacker argue that the court of appeals' interpretation is contrary to the legislative intent of the statute, as well as DHSS's longstanding interpretation. The court of appeals read the statute as unambiguously forbidding nursing care in a CBRF. The court of appeals stated:

> Section 50.01(1g) must be read as if commas were placed before and after the phrase "but not including nursing care." The phrase, "as a primary function of the facility," modifies the clause, "a place where five or more unrelated adults reside in which care, treatment or services above the level of room and board . . . are provided." It does not modify the phrase, "but not including nursing care." The statute is unambiguous.

*Hacker*, 189 Wis. 2d 333-34.

■
We disagree with the court of appeals' determination that § 50.01(1g) is unambiguous. As the parties point out, it is difficult to perceive how a statute is unambiguous if one must change the statute's punctuation by adding commas in order to ascertain its meaning. We find that the statute is capable of two meanings, in that the phrase "but not including nursing care" may or may not be modified by the phrase "as

a primary function of the facility." We therefore must ascertain the Legislature's intent in drafting § 50.01(1g) by examining the "scope, history, context, subject matter and object of the statute." *SueAnn A.M.*, 176 Wis. 2d at 678.

Section 3, ch. 413, Laws of 1975 first defined CBRFs. It provided:

> "Community-based residential facility" means a place where 3 or more unrelated adults reside in which care, treatment or services above the level of room and board but less than skilled nursing care is provided to persons residing in the facility. Such care, treatment or services is provided as a primary function of such facility.

That definition was repealed and recreated by § 4, ch. 170, Laws of 1977, which provided new definitions under then-Wis. Stat. § 50.01:

> (1) "Community-based residential facility" means a place where 3 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility. "Community-based residential facility" does not include a nursing home, except that the department may designate a category or categories of intermediate care facilities which serve fewer than 20 residents and which otherwise meet the definition of this subsection to be licensed and regulated as community-based residential facilities. . . .

Section 4, Chapter 170, Laws of 1977 also provided the following definitions of "intermediate care facility" and "nursing home":

(2) "Intermediate care facility" means a facility which provides 24-hour services including board, room and personal care to 3 or more unrelated residents who, because of their mental or physical condition, require, on a regular basis, health-related care and services, including intermittent nursing care, but who do not require the degree of care and treatment which a hospital or skilled nursing home is designed to provide. "Intermediate care facilities" include all facilities defined as such under Title XIX of the Social Security Act, 42 U.S.C.A. 1396d.

(3) "Nursing home" means:

(a) An institution which provides 24-hour services including board, room, and personal care to 3 or more unrelated residents who because of their mental or physical condition require skilled nursing care.

(b) An intermediate care facility, except an intermediate care facility designated as a community-based residential facility under sub. (1). . . .

Chapter 170 of the Laws of 1977 thus set out a three-tiered scheme: facilities could either be nursing homes, at which nursing care is allowed; intermediate care facilities, at which "intermittent nursing care" is also allowed; or CBRFs. Under the new language of § 50.01, DHSS could "designate a category or categories of intermediate care facilities which serve fewer than 20 residents and which otherwise meet the definition of this subsection to be licensed and regulated as community-based residential facilities." This implies that nursing services could be provided at CBRFs, because such services were clearly allowed at intermediate care facilities, and intermediate care facilities could also be designated as CBRFs. As a result, the phrase "but not including nursing care" was clearly

modified by the phrase "as a primary function of the facility" in the 1977 definition of a CBRF. Any other reading would not allow nursing services to be provided, contrary to the clear language of the statutes creating the three-tiered scheme.

The Legislature again amended the definition of a CBRF in § 358b, ch. 418, Laws of 1977:

> 50.01(1) "Community-based residential facility" means a place where 3 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility. ~~"Community-based residential facility" does not include a nursing home~~, except that the department may ~~designate a category or categories of intermediate care facilities~~ approve an application from a nursing home which ~~serve~~ serves fewer than 20 residents and which otherwise ~~meet~~ meets the definition of this subsection to be licensed and regulated as a community-based residential ~~facilities~~ facility. . . .

Section 358d, ch. 418, Laws of 1977 repealed the definition of "intermediate care facility." Section 358g, ch. 418, Laws of 1977 amended the definition of "nursing home":

> 50.01(3)(a) ~~An institution~~ A place which provides 24-hour services including board~~,~~ and room ~~and personal care~~ to 3 or more unrelated residents who because of their mental or physical condition require ~~skilled~~ nursing care or personal care in excess of 7 hours a week, unless the facility has been designated as a community-based residential facility under sub. (1).

These changes created a two-tiered scheme: facilities were now either nursing homes or CBRFs. A

nursing home could provide nursing care "in excess of seven hours a week"; the implication, especially in light of our determination that some nursing services were allowed at CBRFs under the language of the prior version of the statute (which remained unchanged), was that CBRFs could provide some nursing care, but less than seven hours a week of nursing care.[5]

In addition to the legislative history of § 50.01(1g), we may look to DHSS's interpretation of the statute. DHSS and Ms. Hacker, and the decision of the hearing examiner as well, note that DHSS's interpretation of § 50.01(1g) has allowed up to seven hours a week of nursing services to be performed in a CBRF. DHSS's interpretation is demonstrated by the preface to the chapter of the Administrative Code in which DHSS promulgates regulations related to CBRFs, which provides that a CBRF is "[a]ny home or facility ... where 3 or more adults . . . receive helping or supportive or protective services in addition to board and room, but not nursing care *on any permanent basis*." Wis. Admin. Code § HSS 3 (Aug. 1994) (preface) (emphasis added). DHSS adopted this preface to chapter three of the Wisconsin Administrative Code in 1978. *See* 272 Wis. Admin. Reg. 11 (Aug. 1978). DHSS and Ms. Hacker also point out that Wis. Admin. Code § HSS 3.23(4)(b) (Aug. 1994) provides that "[t]here shall be a written order for any prescription medications, treatments, physical therapy or medically modified diets provided

---

[5] Section 50.01(1g) was again amended in 1989 Wis. Act 31, §§ 1533-1534. This amendment deleted the language allowing some nursing homes to be designated as CBRFs, which was no longer necessary due to the elimination of intermediate care facilities, the only facilities that could be so designated. This later amendment does not affect our determination that § 50.01 (1g) allows a CBRF to provide some nursing care.

or arranged by the CBRF," which appears to imply that treatments, such as nursing services, may be provided by a CBRF.[6]

■

Both DHSS and Ms. Hacker note that the Legislature has amended § 50.01(1g) since the statements in Wis. Admin. Code § HSS 3 allowing some nursing care to be provided in CBRFs have been in effect without changing the language relied upon by DHSS. *See* 1989 Wis. Act. 31, §§ 1533, 1534. Under these circumstances, the Legislature is presumed to have endorsed the agency's interpretation of the statute. *Layton Sch. of Art & Design v. WERC*, 82 Wis. 2d 324, 340, 262 N.W.2d 218 (1978) ("Long-standing administrative construction of a statute is accorded great weight in the determination of legislative intent because the legislature is presumed to have acquiesced in that construction if it has not amended the statute."); *see also Town of Vernon v. Waukesha County*, 102 Wis. 2d 686, 693, 307 N.W.2d 227 (1981).

This court has applied three levels of deference to conclusions of law and statutory interpretation in agency decisions:

> First, if the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, then the agency determination is entitled to "great weight." [*Sauk County v.*

---

[6] The court of appeals in this case noted that Wis. Admin. § Code 3.04(2)(a) (Aug. 1994) does not include nursing services in its list of "supportive services." *See Hacker*, 189 Wis. 2d at 334 & n.4. However, that section also states that supportive services "may include but are not limited to" the services listed. We conclude that this code section does not preclude providing nursing services at a CBRF.

*WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267 (1991).] The second level of review provides that if the agency decision is "very nearly" one of first impression it is entitled to "due weight" or "great bearing." *Id.* at 413-14. The lowest level of review, the *de novo* standard, is applied where it is clear from the lack of agency precedent that the case is one of first impression for the agency and the agency lacks special expertise or experience in determining the question presented.

*Jicha v. DILHR*, 169 Wis. 2d 284, 290-91, 485 N.W.2d 256 (1992). The court of appeals in this case held that "[w]hile many of the issues in this case are within DHSS's special expertise or experience, the scope of § 50.01(1g) is not." *Hacker*, 189 Wis. 2d at 330. The court of appeals concluded that its standard of review on the meaning of the statute was de novo. *Id.*

■

We conclude that the court of appeals erred in holding that DHSS lacked special expertise or experience in determining the scope of § 50.01(1g). While DHSS does not cite any cases in which it has demonstrated experience in interpreting the statute, it has interpreted the statute through its administrative rules during the almost twenty years since the statute's creation. Furthermore, the Legislature has not amended the language of § 50.01(1g) to contradict DHSS's interpretation, and is thus deemed to have acquiesced in the agency's interpretation. *Layton*, 82 Wis. 2d at 340; *Town of Vernon*, 102 Wis. 2d at 693. We conclude that DHSS's interpretation should be accorded "great weight" under these circumstances. Under this standard, we uphold DHSS's interpretation of a statute unless it is irrational. *Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267 (1991).

■ We conclude that the court of appeals erred in concluding that § 50.01(1g) does not allow nursing services to be performed at a CBRF. The legislative history of the statute, as described above, demonstrates that some level of nursing services, but less than seven hours per week, could be provided at a CBRF. In addition, DHSS's long-standing interpretation of the statute, which in light of the agency's expertise in the area of regulating nursing care should be afforded great weight, is consistent with our reading of the legislative history. We hold that § 50.01(1g) does allow for up to seven hours of nursing services per week per resident to be provided at a CBRF and that the court of appeals erred in concluding otherwise.

Ms. Hacker next raises two arguments relating to the adequacy of the notice she was provided. Wisconsin Stat. § 50.03(5)(b) (1993-94) provides that a notice of revocation under chapter 50 must "include a clear and concise statement of the violations on which the . . . revocation is based, the statute or rule violated and notice of the opportunity for an evidentiary hearing . . . ." Ms. Hacker notes that DHSS's notice of revocation cited only Wis. Stat. § 50.09(1)(L), which provides that residents at CBRFs have the right to "adequate and appropriate care within the capacity of the facility," as the basis for revocation arising from Ms. Hacker's performing rectal examinations, enemas, and removing bowel impactions. Ms. Hacker claims that the hearing examiner's conclusion of law, which found that Ms. Hacker violated § 50.09(1)(L) because certain nursing procedures had been performed without a physician's order, appears to rest primarily on other code provisions, particularly Wis. Admin. Code § HSS 3.23(4)(b). Section HSS 3.23(4)(b) provides:

"There shall be a written order for any . . . treatments . . . provided or arranged by the CBRF."

Ms. Hacker cites *Bracegirdle v. Department of Regulation and Licensing*, 159 Wis. 2d 402, 464 N.W.2d 111 (Ct. App. 1990) for the proposition that a change in the "fundamental nature" of the charge against her, such as the change she alleges occurred in the instant case, is a violation of her due process rights. In *Bracegirdle*, a nurse had been charged with using excessive force in attempting to remove a patient's dentures. The hearing examiner concluded that the evidence did not show that the nurse had used excessive force, and recommended dismissing the complaint against her. *Id.* at 410. The Board of Nursing accepted the examiner's finding that the evidence did not show excessive force, but nonetheless amended the hearing examiner's conclusions of law in order to find a violation of a separate administrative code provision forbidding "mental pressure" against a resident. *Id.* at 410-11. The Board of Nursing had not included this charge in its notice of charges against the nurse. The court of appeals reversed, holding that the nurse had not received fair notice, and that she had not been given the opportunity to contest the charge at her hearing. *Id.* at 417-18.

DHSS argues that there was no later substitution of an alternative charge in the instant case, as occurred in *Bracegirdle;* rather, the hearing examiner found that Ms. Hacker violated the same statute cited in the notice of revocation. DHSS notes that its notice of revocation did cite § 50.09(1)(L), and the hearing examiner relied upon facts provided in the notice of revocation in reaching the conclusion that § 50.09(1)(L) had been violated. DHSS argues that the hearing examiner's discussion of HSS § 3.23(4)(b) was simply using the

standards provided in that provision to determine what was "appropriate care" under § 50.09(1)(L). Under Wis. Stat. § 227.45(4) (1993-94),[7] the hearing examiner is required to take notice of the provisions of the Wisconsin Administrative Code. DHSS argues that requiring a citation to every rule which might be relevant to the violation would "be virtually impossible to comply with" and would require the notice to be "in the nature of a legal brief."

We agree with DHSS. Ms. Hacker's notice of revocation listed § 50.09(1)(L) as the statute violated, and the hearing examiner found a violation of that same statute based on the facts alleged in the notice. The hearing examiner properly turned to other sections of the administrative code in determining the nature of "appropriate care" under § 50.09(1)(L). Section 50.03(5)(b) does not require DHSS to cite every section to which an examiner may refer in reaching a conclusion, but only the statute violated. DHSS complied with this requirement. We conclude that Ms. Hacker was provided adequate notice under § 50.03(5)(b).

Ms. Hacker also argues that she was deprived of adequate notice because the notice of revocation alleged that certain of the incidents occurred on "March 22 or March 24, 1991,"[8] whereas the hearing

---

[7] That section provides:

(4)   An agency or hearing examiner shall take official notice of all rules which have been published in the Wisconsin administrative code or register.

[8] This date was one of the items DHSS amended after its first notice of revocation. DHSS's September 17 notice of revocation stated that the alleged incidents occurred on March 22, 1991. The October 30 notice of revocation stated that the alleged incidents occurred on "March 22 or March 24, 1991."

examiner concluded that the events occurred, but not on the specified dates. Ms. Hacker contends that she was mislead by the notice of revocation into attempting an alibi defense, introducing evidence showing that the incident could not have occurred on either of the dates provided.

Ms. Hacker's argument fails here, as it did at the court of appeals, because she provides no authority for her claim that DHSS must allege and prove exact dates for violations. *See Hacker*, 189 Wis. 2d at 341-42. The authorities Ms. Hacker cites, *Schramek v. Bohren*, 145 Wis. 2d 695, 429 N.W.2d 501 (Ct. App.), *review denied*, 147 Wis. 2d 889, 436 N.W.2d 30 (1988), and *Sieger v. Wisconsin Personnel Comm'n*, 181 Wis. 2d 845, 512 N.W.2d 220 (Ct. App. 1994), do not support her position. *Schramek* requires only that "[w]hen the rights of a person are affected by judicial or quasi-judicial decree, adequate due process requires that the notice must reasonably convey information about the proceedings so that the respondent can prepare a defense or make objections," *Schramek*, 145 Wis. 2d at 704 (citing *In re Estate of Fessler*, 100 Wis. 2d 437, 447, 302 N.W.2d 414 (1981)), not that a notice under § 50.03(5)(d) must allege specific dates. In fact, the court in *Schramek* did not comment on the presence or absence of a specified date when it examined the notice at issue in the case. *Id.* at 705. Similarly, the court of appeals in *Sieger* reversed an agency's decision because an employee at an administrative hearing had not had an opportunity to provide evidence on a significant issue due to various errors of law on the part of both the hearing examiner and the parties' counsel. *Sieger*, 181 Wis. 2d at 863-67. Notice was not at issue in the case, and nothing in it supports Ms. Hacker's contention that notice of a specific date is required here.

465

We find no evidence in the record that Ms. Hacker suffered an inability to prepare a defense. Ms. Hacker's notice of revocation described the incidents resulting in the violation. DHSS presented witnesses, Eleanor Sprague and Diane LaHaye, describing the incidents; these witnesses claimed to have been working on the same shift when the incident occurred. Ms. Hacker presented evidence, including payroll records, showing that the two witnesses had not worked together on the two dates on which DHSS alleged the incidents might have occurred. However, Ms. Hacker did admit that she performed a bowel impaction check while one of the witnesses was present. The hearing examiner discussed this portion of the evidence as follows:

> The accountant for Harbor Inn and Shannon Home presented evidence which contradicted Mrs. Sprague and Diane LaHaye's testimony that they worked overlapping shifts on the date of the incident relating to resident F. The accountant had no first hand knowledge of when people actually worked, however. He was relying on time records from the facilities. There was so much testimony in the record that the time records were subject to gross inaccuracies, that I cannot conclude Mrs. Sprague and Diane LaHaye were lying when they said they worked overlapping shifts. . . . Because I did not find the records of the two facilities to be reliable, I could not conclude that testimony which conflicted with those records was not credible. I am convinced, from Mrs. Sprague's own admission, that the date contained in the notice of revocation for the incident with resident F is not correct, however, I believe the incident occurred as described in the notice of revocation and the hearing testimony of Mrs. Sprague and Ms. LaHaye.

The examiner found DHSS's witnesses credible and made a specific finding that the event occurred, even though the specific date was unknown. Ms. Hacker cannot reasonably claim that she was not aware of the alleged violation when the hearing examiner found that the event occurred "as described in the notice of revocation." We conclude, as did the court of appeals, that "[t]he exact date of the March 22 or 24 event was irrelevant." *Hacker*, 189 Wis. 2d at 341.

Ms. Hacker next argues that several of the findings of the hearing examiner are not supported by substantial evidence. Wisconsin Stat. § 227.57(6) (1993-94) provides our standard of review:

> **(6)**  If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

On review of an administrative decision, "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *La Crosse Police Comm'n v. LIRC*, 139 Wis. 2d 740, 765, 407 N.W.2d 510 (1987) (citing *Gilbert v. Medical Examining Bd.*, 119 Wis. 2d 168, 195, 349 N.W.2d 68 (1984)).

The hearing examiner found four code violations arising from four separate incidents. First, the hearing examiner found that sometime around March 22 or 24,

1991,[9] Ms. Hacker instructed a nurse to give three doses of Milk of Magnesia to a resident of Shannon Home. The doses of Milk of Magnesia were two tablespoons each, for a total of three ounces. The resident later suffered severe diarrhea, which left her feverish and shaky, although the hearing examiner stated she did not conclude that the diarrhea was caused by the Milk of Magnesia. The hearing examiner concluded, however, that Ms. Hacker had failed to provide "adequate and appropriate care" under § 50.09(1)(L) by giving the resident an amount of Milk of Magnesia in excess of physician's orders, and by failing to notify a physician of the resident's condition.

Ms. Hacker first argues that the hearing examiner's conclusions are not supported by substantial evidence because payroll records showed that the two witnesses, Eleanor Sprague and Diane LaHaye, could not have been present on the dates alleged in the notice of revocation. As we noted above, however, the hearing examiner made a specific finding that she found the witnesses' description of the events to be credible. The examiner noted that the events apparently had not occurred on the dates alleged in the notice of revocation, but found the witnesses' testimony about the event credible in spite of their inaccurate recollection of the date. On this review, this court is not to "substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." Wis. Stat. § 227.57(6). Accordingly, we will not disturb the hearing examiner's findings on this issue.

---

[9] As already noted, the exact date of this incident remains unclear. For convenience, however, we will refer to the incident as the "March 22 or 24 incident."

■

Ms. Hacker also claims that there is no evidence in the record to support the hearing examiner's finding that Ms. Hacker did not contact a doctor during the March 22 or 24 incident. DHSS's witnesses, two nurses on duty at Shannon Home, testified that they had not observed Ms. Hacker notify a physician while she was in their presence. The nurses had phoned Ms. Hacker, who was away from the facility when the resident suffered the attack of diarrhea, to summon her to the facility. Ms. Hacker argues that because the nurses were calling Ms. Hacker on the telephone, they were not in a position to observe whether Ms. Hacker contacted a physician before arriving at Shannon Home. However, Ms. Hacker had ample opportunity at her four-day hearing to provide evidence of any contact with a physician at another time; she provided none. In addition, we note that the resident's medical file does not show a call to her physician during the time in question. We conclude that the hearing examiner's finding that Ms. Hacker did not contact a physician during the March 22 or 24 incident is supported by substantial evidence in the record.

■

Ms. Hacker also argues that the hearing examiner improperly relied on habit and pattern evidence in finding that Ms. Hacker had performed an enema on a resident and removed a bowel impaction during the March 22 or 24 incident. The relevant portion of the hearing examiner's decision states:

> I find the witnesses' testimony that Mrs. Hacker gave the resident an enema and manually removed a bowel impaction to be credible. There is testimony from other witnesses, including Joan Lund, Shelley Hacker, and the licensee herself, that

she gave residents enemas and rectal exams and removed impactions. These nursing procedures appear to have been a normal activity, and their routine nature makes it more likely that the specific incident occurred.

Ms. Hacker claims that such pattern and practice evidence is generally not admissible to prove a specific occurrence under *Hart v. State*, 75 Wis. 2d 371, 249 N.W.2d 810 (1977). DHSS argues that the hearing examiner only used the contested evidence to support a determination that she had already made: that the incident occurred based on the testimony of DHSS's witnesses. We agree with DHSS. Whether or not the hearing examiner also relied on pattern and practice evidence in finding that the events occurred is irrelevant in light of the fact that the hearing examiner's conclusion was based on the testimony of witnesses that the hearing examiner found credible.

Second, Ms. Hacker argues that there is no substantial evidence that the three ounces of Milk of Magnesia given to the resident were in excess of a physician's order. Ms. Hacker points to a physician's note dated February 12, 1991, which states that the resident was to be administered Milk of Magnesia "p.r.n." "P.R.N." is an abbreviation for the Latin phrase "pro re nata," meaning "as the occasion arises." *Stedman's Medical Dictionary* 1258 (25th ed. 1990). Ms. Hacker observes that this note is the last evidence of a doctor's order before the alleged dates of the incident, March 22 or 24, 1991. From this, Ms. Hacker argues that the hearing examiner could not have concluded that the three ounces of Milk of Magnesia given to the resident were excessive, because there is no limitation on the physician's order as written.

The record also contains a "Discharge Summary" dated December 20, 1990, which states the resident's dose of Milk of Magnesia as "30 cc qd prn," or thirty cubic centimeters (approximately one ounce) of Milk of Magnesia per day as needed. One witness, a registered pharmacist, testified that the prescription for the resident was for a concentrated form of Milk of Magnesia, for which the daily dose was 15 c.c., or one-half ounce. That witness also testified that a patient should receive no more than 15 c.c. of concentrated Milk of Magnesia per day. Another witness, a registered nurse, testified that giving a patient three ounces of Milk of Magnesia would have exceeded the physician's order. The hearing examiner acknowledged in her decision that there was conflicting evidence as to whether or not the Milk of Magnesia given the resident was concentrated, but concluded that three ounces of either concentration was in excess of a physician's order. We conclude that there is relevant evidence in the record from which the hearing examiner could have reasonably concluded that the dose of Milk of Magnesia exceeded a doctor's order.

Third, Ms. Hacker disputes the hearing examiner's conclusion that Ms. Hacker did not call a physician or act under a doctor's orders in performing a bowel impaction removal on a resident during May 1991 and removing a bowel impaction from another resident between May and August 1991. Ms. Hacker claims that there is no evidence to support the hearing examiner's conclusion that Ms. Hacker had performed the treatments without obtaining doctor's orders. The hearing examiner, in her decision, stated: "There is no dispute in this case that the care was not given pursu-

ant to orders of a physician" and made the finding that Ms. Hacker had neither a specific written order nor standing written orders for the above-described treatments. Ms. Hacker testified and was cross-examined at length, and described all the alleged incidents in detail, but never stated that she had acted under order of a physician, or that she had contacted a physician, nor did she provide any other evidence of orders or contact. The other witnesses to the incidents also described the events at length without any mention of physician's orders or contact.[10] We conclude that the hearing examiner could reasonably conclude from the evidence in this case that Ms. Hacker had performed the procedures without written orders from a physician.

We also note, as did the court of appeals, that the manner in which Ms. Hacker performed the bowel impaction removal in the May-August 1991 incident supports the hearing examiner's conclusion that Ms.

---

[10] The record shows that part of Ms. Hacker's defense was that procedures such as those she performed were normally undertaken without doctor's orders. Ms. Hacker presented witnesses who testified that they sometimes performed the procedures in the absence of physician's orders, and Ms. Hacker herself testified that she had performed and ordered bowel impaction checks and bowel impaction removals without orders from a doctor while she had worked in nursing homes before operating her CBRF's. However, the hearing examiner rejected this defense in her written decision. The hearing examiner noted that the staff at CBRF's need more extensive contact with physicians because CBRF's are not required to have the medical and nursing administrative personnel and procedures that nursing homes are. According to the hearing examiner, this is the rationale behind DHSS's rule that all treatments at a CBRF are to be provided only with a physician's order. *See* Wis. Admin. Code § 3.23(4)(b).

Hacker failed to provide "adequate and appropriate care" under Wis. Stat. § 50.09(1)(L). *See Hacker,* 189 Wis. 2d at 337. The hearing examiner found that Ms. Hacker, in performing the bowel impaction removal, covered her hand with a plastic sandwich bag and used "Crisco," described by the witness as "cooking grease," as a lubricant. The hearing examiner noted that "Crisco" could sometimes be a safe lubricant, but added:

> [U]sing an open can of Crisco from the kitchen which has been used in food preparation, and possibly contaminated with food particles, is improper. Even if [Hacker] visually inspected the Crisco and saw no impurities, it is not the same as using Crisco from a "med cart" in a nursing home.

We agree with the hearing examiner, and the court of appeals, that the record provides substantial evidence that Ms. Hacker failed to provide "adequate and appropriate care" by using a possibly contaminated lubricant in performing a bowel impaction removal.

Fourth, Ms. Hacker disputes the hearing examiner's conclusion that Ms. Hacker failed to treat a resident with "courtesy, respect and full recognition of the resident's dignity and individuality," pursuant to Wis. Stat. § 50.09(1)(e), by "yelling" at a resident and "calling [the resident] names." Ms. Hacker points to the fact that the hearing examiner also found that the resident in question had engaged in behavior posing a risk to another resident. Ms. Hacker says that the question is "whether correcting resident action that poses a risk to others in a forceful manner is a violation of the resident's rights to courtesy and respect." However, this question was already answered by the hearing examiner, who found that although the resident in question

had been disruptive, Ms. Hacker's response was overly severe. The hearing examiner stated:

> [The] testimony establishes that on at least two occasions, Mrs. Hacker yelled at [the] resident and called her a troublemaker or called her crazy. I am also persuaded that the resident engaged in behavior which posed a risk to at least one other resident, such as hitting at her or blocking her access to rooms. Even if the resident's behavior required a response, however, the treatment accorded her by Mrs. Hacker violated the rule relating to courteous treatment of residents.

■

The record provides substantial evidence in support of the hearing examiner's conclusions. Witnesses testified that Ms. Hacker "yelled very loud" at the resident, called her a "liar" and a "troublemaker." As the hearing examiner noted, the possibility that Ms. Hacker might have been justified in making some response to the resident's actions does not permit her to yell at the resident and call her names. We conclude that these statements are substantial evidence supporting the hearing examiner's conclusion that Ms. Hacker violated § 50.09(1)(e).

■

Ms. Hacker next argues that the hearing examiner erroneously concluded that the nursing services Ms. Hacker performed could not be provided at a CBRF without a physician's order. This requires us to review the hearing examiner's conclusions of law. As we have already noted, DHSS's interpretation of what services are allowed at a CBRF is entitled to "great weight" under *Jicha*, 169 Wis. 2d at 290-91. We conclude that the hearing examiner correctly concluded that the services Ms. Hacker performed in a CBRF required a

physician's order. While Ms. Hacker points to various provisions of the Wisconsin Administrative Code relating to general standards of practice for professional nurses[11] as authority for her position that the treatments in question did not require a physician's order, the hearing examiner in this case properly relied on the specific code provisions relating to CBRFs, including Wis. Admin. Code § 3.23(4)(b), which plainly requires "a written order for any . . . treatments . . . provided or arranged by the CBRF." The hearing examiner concluded that "[t]he protection of residents is assured in community-based residential facilities by a requirement that where nursing treatment is provided, there must be written orders from a physician." We note that two of Ms. Hacker's own witnesses, both licensed practical nurses, testified that enemas should not be given without a physician's order. A nurse from DHSS's Bureau of Quality Compliance also testified that such a procedure required a physician's order. We cannot conclude that the hearing examiner erred in finding that the procedures Ms. Hacker performed were treatments requiring a physician's order under § 3.23(4)(b).

We next consider whether the revocation of Ms. Hacker's CBRF licenses constituted an erroneous exercise of discretion. DHSS may revoke the license of a CBRF under Wis. Stat. § 50.03(5)(a) (1991-92), the statute in effect at the time of the violations.

Ms. Hacker points to the testimony in the record of David Edie, the director of DHSS's Office of Regulation and Licensing who issued both the September 17 and October 30 notices of revocation. Mr. Edie testified that license revocation is the most severe penalty available to DHSS; the department may also issue a "non-com-

[11] Hacker cites Wis. Admin. Code § N 6.01-.04 (Dec. 1993).

pliance statement" or a "30-day notice to correct" in response to code violations. Mr. Edie also testified that he based his decision to attempt to revoke Ms. Hacker's CBRF licenses on the allegations made in the original notices of revocation.

Ms. Hacker notes that the hearing examiner concluded that only four of the twenty-one code violations DHSS alleged were proven against her. Ms. Hacker also notes that three of the violations occurred at Shannon Home and only one occurred at Harbor Inn, and that none of the violations involved resident abuse,[12] which Mr. Edie had testified was a consideration in his choice of revocation as a penalty. Ms. Hacker cites *Reidinger v. Optometry Examining Bd.*, 81 Wis. 2d 292, 297-98, 260 N.W.2d 270 (1977), and *McCleary v. State*, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971), for the proposition that an exercise of discretion must be more than merely a choice between alternatives without an explanation of the rationale for the choice. Ms. Hacker argues that the hearing examiner in the present case failed to provide a rationale for retaining license revocation as the penalty in spite of the fact that the large majority of the alleged violations were not proven.

DHSS replies that the hearing examiner provided a twenty-eight page discussion prior to concluding that "[t]he Department may revoke the community-based residential facility licenses of Shannon Home and Harbor Inn." However, as Ms. Hacker points out, the twenty-eight pages of discussion never explains the reasoning behind the choice of penalty. Our examina-

---

[12] Specifically, Ms. Hacker notes that Wis. Stat. § 50.09(1) (k) (1993-94) prohibits "mental and physical abuse" to CBRF residents. Hacker was found in violation of § 50.09(1)(e), which requires residents to be treated with "courtesy and respect," for the incident which involved yelling at a resident.

tion of the hearing examiner's decision leads us to conclude that Ms. Hacker is correct. The hearing examiner did state at one point in the decision:

> The evidence relating to each allegation cited by the Department in support of its decision to revoke the license for Shannon Home is discussed below, *followed by a discussion of the reasons why the allegations which were proved in the hearing support the decision to revoke that license.*

(Emphasis added.) Similarly, the hearing examiner later stated:

> The evidence relating to each allegation cited by the Department in support of its decision to revoke the license for Harbor Inn is discussed below, *followed by a discussion of the reasons why the allegations which were proved in the hearing support the decision to revoke that license.*

(Emphasis added.) However, the discussion following each of these statements is limited solely to an examination of the evidence offered to support each allegation. The hearing examiner never provided any explanation why the proven allegations supported the decision to revoke. Instead, the examiner simply followed the discussion of the evidence supporting the violations with the conclusion that DHSS could revoke Ms. Hacker's licenses. DHSS argues that the hearing examiner reached the conclusion that DHSS could revoke Ms. Hacker's licenses after finding four substantial code violations, and thus the hearing examiner must have considered these violations sufficiently severe to warrant revocation. We find Ms. Hacker's analogy to our decision in *Reidinger*, 81 Wis. 2d at 292, more persuasive.

In *Reidinger*, an optometrist challenged the revocation of his license to practice optometry by the Optometry Examining Board (Board). The optometrist had been convicted of tax evasion. Following a hearing, the Board revoked his license. The Board issued findings of fact, conclusions of law, and an order which stated only that the optometrist had been convicted of a felony, and that the optometrist's license would be revoked pursuant to Wis. Stat. § 449.07(1)(d) (1975), which provided that the Board "may" revoke the license of a licensee convicted of a felony. *Id.* at 296-97.

This Court noted that the word "may" in the statute implied an exercise of discretion by the Board in choosing whether or not to revoke a licensee's license, *id.* at 298, and that "[d]iscretion is more than a choice between alternatives without giving the rationale or reason behind the choice." *Id.* at 297. The Court quoted *McCleary*, 49 Wis. 2d at 277:

> In the first place, there must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. The process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards. As we pointed out in [*State v. Hutnik*, 39 Wis. 2d 754, 764, 159 N.W.2d 33 (1968)], ". . . there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth."

The Court found that the Board had failed to show that it exercised its discretion. *Id.* at 298. The Court noted that the purported goal of authorizing the Board to revoke licenses was the protection of the public, and

that there was no reference to the protection of the public in the Board's findings, conclusion, or order. The Board had also failed to explain how the felony committed affected the fitness of the licensee to practice optometry. *Id.*

In the present matter, the hearing examiner concluded that four substantial code violations occurred, and then ordered that DHSS could revoke Ms. Hacker's CBRF licenses pursuant to § 50.03(5)(a), which, like the statute at issue in *Reidinger*, provided that DHSS "may" revoke a license after a finding of a substantial violation of a code provision. There is no explanation why DHSS's most severe penalty should still apply in spite of the fact that only four violations were found out of the twenty-one alleged. Furthermore, as Ms. Hacker notes in her brief:

> There is no finding, and no evidence, that these four isolated alleged violations at two separate facilities were intentional or wanton. There is no evidence of any aggravating circumstance that would cause these incidents, at facilities with previously clean records, to require an immediate escalation to the ultimate sanction of license revocation. There is no evidence of any prior similar, or indeed any prior, code violations. . . . This creates the possibility that the Department has chosen to revoke the licenses based on allegations that were not proven, rather than on the basis of those that were.

DHSS argues that the hearing examiner did discuss the relationship between the violations and resident care. The hearing examiner at one point states that the rectal examinations, enema, and bowel impaction removal procedures, when performed without the order of a physician, was a substantial violation

"because it threatens the well-being of the resident." However, this language is directed at why the violation is substantial, not why the violation justifies a revocation. Our examination of the hearing examiner's decision finds no explanation of the rationale behind the hearing examiner's exercise of discretion in choosing revocation as a penalty. Essentially, DHSS's argument presents the same reasoning we found erroneous in *Reidinger*. In that case, this court found that an administrative agency which had the discretion to revoke a license based on a felony conviction could not simply rely on the finding of a felony conviction, without more, as a rationale for its exercise of discretion; so here, the mere finding that a substantial violation occurred, without a discussion of why the facts behind the violation support a license revocation, cannot serve as an explanation for the department's choice of revocation as a penalty.

However, we are not critical of the hearing examiner's failure to provide reasons for revocation, because we cannot justify the revocation either. We conclude that it would be an erroneous exercise of discretion to revoke Ms. Hacker's CBRF licenses, given that the hearing examiner found only four violations out of twenty-one charged, and given the nature of the proven violations. We therefore hold that DHSS erroneously exercised its discretion in revoking Ms. Hacker's licenses, and reverse the court of appeals decision upholding DHSS's revocation of Ms. Hacker's licenses. We remand this case to the Department of Health and Social Services for a determination of alternative[13] sanctions for the violations found against Ms. Hacker.

---

[13] We note that Wis. Stat. § 50.03(8) (1991-92), in effect at the time of the violations, allowed the department to impose a

Finally, at oral argument in this case counsel for Ms. Hacker informed the court that Ms. Hacker had forfeited her CBRF licenses because this court had initially, through a clerical error, erroneously informed Ms. Hacker that her petition for review had been denied. Ms. Hacker then surrendered her licenses. In fact the petition for review had been granted. DHSS's counsel assured the court that DHSS would normally not have revoked Ms. Hacker's licenses until the end of the present court proceedings. Ms. Hacker should not have lost her licenses through a clerical error of this court. Therefore, we order DHSS to reinstate Ms. Hacker's CBRF licenses immediately, or, if necessary, to give her a reasonable time to reestablish such facilities if she wishes to do so.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the Department of Health and Social Services for further proceedings not inconsistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). I write separately to emphasize my concern that the factual allegations contained in DHSS' October 30 revocation letter did not provide Hacker with adequate notice of her alleged violation of Wis. Admin. Code § HSS 3.23(4)(b).

---

fine of not less than $10 nor more than $1000 for each violation. We also note that, as described in the testimony of David Edie, the director of DHSS's Office of Regulation and Licensing, DHSS's practice was to issue either a "non-compliance statement" or a "30-day notice to correct" as alternatives to revocation.

As the majority notes, majority op. at 462, a notice of revocation under Wis. Stat. § 50.03(5)(b) must contain "a clear and concise statement of the violations on which the nonrenewal or revocation is based, the statute or rule violated and notice of the opportunity for an evidentiary hearing." Section 50.03(5)(b) was not part of § 3, ch. 413, Laws of 1975, which created chapter 50. However, Wis. Stat. § 50.03(5)(b) was added during the next legislative session as part of an effort both "to provide for the due process and other rights of facility residents and operators"[1] and "[t]o relieve procedural confusion."[2]

The notice provided to Hacker in this case raises due process concerns and compounds the procedural confusion which Wis. Stat. § 50.03(5)(b) was designed to alleviate. Although she was informed that she had violated Wis. Stat. § 50.09(1)(L) (1993-94) by failing to provide "adequate and appropriate care" to all facility residents, Hacker was given no clue that she had thereby violated Wis. Admin. Code § HSS 3.23(4)(b), which required her to procure "a written order for any prescription medications, treatments, physical therapy or medically modified diets provided or arranged" for the residents of her facility.

As the majority correctly observes, Wis. Stat. § 50.03(5)(b) "does not require DHSS to cite every section to which an examiner may refer in reaching a conclusion." Majority op. at 464. But it does not thereby follow that citing a general statutory provision giving no indication of the particular infractions alleged

---

[1] Section 1, ch. 170, Laws of 1977 (stating the legislative intent and creating Wis. Stat. § 50.03(5)(b)).

[2] Drafter's Comment, Legislative Reference Bureau drafting file to ch. 170, Laws of 1977.

against a licensee constitutes sufficient notice to that licensee under Wis. Stat. § 50.03(5)(b).

Because DHSS gave Hacker no indication that she had violated Wis. Admin. Code § HSS 3.23(4)(b), it failed to comply with the plain language and thwarted the stated purpose of Wis. Stat. § 50.03(5)(b). A letter announcing that one has broken a general law cannot substitute for specific notice of which laws one has broken.

For the reasons set forth, I concur in the mandate.